### THE HOLLADAY CASE.

### HICKOX v. ELLIOTT and others.

*(Circuit Court, D. Oregon. June 14, 1886.)*

1. CHAMPERTY—LIMITATION.
   The former ruling of this court in this case (10 Sawy. 415, and 22 Fed. Rep. 13) that the agreement made in California on February 10, 1874, between S. G. Elliott and Martin White, for the loan and repayment of money, was to be performed in that state, and is not champertous, and that a suit may be maintained to enforce a security for a debt arising thereon, without reference to whether an action on the debt directly against the debtor can be maintained or not, considered and affirmed.[1]

2. SAME—RES JUDICATA.
   The obligation of White under said agreement, and the fact of his having performed the same, is *res judicata* since July 13, 1875, by the judgment of a competent court in *White* v. *Elliott.*

[1] See note at end of case, pt. 1.

**3.** ATTORNEY'S FEE.

A contract to pay an attorney $400 a month to attend to certain litigation *held* to have been tacitly abandoned by reason of unforeseen delays in the progress of the litigation, and a gross sum allowed for the services of the attorney thereafter.

**4.** COURTS—CONCURRENT JURISDICTION—RECEIVER.

The mere fact that a court has acquired jurisdiction of a suit between a grantor and grantee concerning their rights in certain property, and has taken possession of such property by the appointment of a receiver, does not prevent another court of concurrent jurisdiction from taking jurisdiction of a suit by a creditor of said grantor against said grantee, brought to set aside or postpone the conveyance of said property to the latter on the ground that it was made and received with intent to hinder and delay the plaintiff in the collection of his demand against the grantor; the relief sought may be granted without interfering with the possession of the receiver.

**5.** EQUITY—ANSWER IN EQUITY.

A defendant may answer an allegation in a bill that he has no knowledge, information, or belief concerning the same, and the effect is to leave the matter to be proven by the plaintiff; but such answer is not equivalent, as evidence, to a denial of the fact alleged, nor can the defendant add a direct denial thereof to his answer that he has not even a belief on the subject.

**6.** DEPOSITIONS—OBJECTION TO.

A technical objection to evidence taken in a suit in equity must be made by motion to suppress before the cause is set for hearing.

**7.** EQUITY—CREDITORS' BILL—JUDGMENT—PROOF OF DEBT.

A judgment creditor seeking to set aside conveyances anterior in date to his judgment, because made to hinder and delay him in the collection of his debt, may show by the proceedings in the case prior to the judgment, or other competent evidence, that his debt existed at or prior to the date of such conveyances.

**8.** SAME—INSOLVENCY OF DEBTOR.

It is not necessary to issue an execution on a judgment and have a return of *nulla bona* thereon, to show the insolvency of the judgment debtor, but the fact may be shown by any competent evidence that he has no property subject to the legal process of the court in which the judgment remains.

**9.** FRAUDULENT CONVEYANCE—KNOWLEDGE OF GRANTEE.

It is not necessary that the grantee in a deed made by a debtor to hinder and delay his creditors should have actual knowledge of the grantor's intent to make it void; but it is sufficient if he have knowledge of facts sufficient to put a prudent man on inquiry.[1]

**10.** SAME—CASE IN JUDGMENT.

Conveyances made by an insolvent debtor to his brother, who was a large creditor, of all his property in the state, the value of the same being considerably in excess of the amount of the grantee's debt, without any settlement or agreement as to values, or cancellation or surrender of the evidences of debt held by the creditor, or any special change in the management of the property included in the conveyances, together with the fact that the grantor continued in the receipt of a large portion of the rents and profits of the property, *held* sufficient evidence of fraudulent intent of the grantor, and of the grantee's participation therein.

Suit in Equity to Set Aside Fraudulent Conveyances.

*James K. Kelly* and *C. E. S. Wood*, for plaintiff.

*Henry Ach*, for defendant Effinger.

*Thomas N. Strong*, for defendant Joseph Holladay.

*J. K. Weatherford*, for defendant Elliott.

DEADY, J. This suit is brought by George C. Hickox, a citizen of California, against Simon G. Elliott, Joseph Holladay, William H.

[1] See note at end of case, pt. 2.

Effinger, and Ben Holladay, as citizens of Oregon, to subject certain property, the legal title of which is now in Joseph Holladay, to the payment of a certain decree, heretofore given by the supreme court of Oregon, against Ben Holladay, on the ground that said property was assigned, transferred, and conveyed to the former by the latter, to hinder and delay his creditors; and that the plaintiff is the assignee of said decree, in trust for Martin White, a creditor of said Elliott. The case was before this court on November 12, 1884, on a demurrer to the bill, and the judgment of the court thereon is reported in 10 Sawy. 415, and 22 Fed. Rep. 13. On March 16, 1885, the suit was dismissed as to Ben Holladay on his plea in abatement, to the effect that he "is a citizen of the city of Washington, in the District of Columbia." The plea was considered as the equivalent of an allegation that the defendant is not a citizen of any state in the Union, and therefore not suable here on the ground of his citizenship.

Briefly, the case stated in the bill, and admitted by the answers or made by the proof, is this:

On September 12, 1868, Elliott entered into a partnership with Ben Holladay and C. Temple Emmet, for the purpose of constructing and operating railways in Oregon, which partnership was engaged in the construction of the road of the Oregon Central Railway Company until November 5, 1869, when Holladay and Emmet commenced a suit in the circuit court for the county of Multnomah to dissolve said partnership, which suit was afterwards transferred to Marion county, where, on September 28, 1877, a decree was made dissolving said partnership and declaring Elliott indebted thereto in the sum of $470, from which decree Elliott took an appeal to the supreme court of the state, wherein, on August 15, 1879, a decree was given dissolving said partnership, and that Elliott recover from Holladay $21,919.46, and from Emmet $8,596.08, together with nine-tenths of the costs in both the appellate and lower court, amounting, as taxed, to $2,710.76; and there is now due on said decree from said Holladay, principal and costs, the sum of $24,630.22, with interest from August 15, 1879, to January 25, 1881, at the rate of 10 per centum per annum, and thereafter at the rate of 8 per centum until date; in all, the sum of $38,806.29.

On February 10, 1874, Elliott, being without means or credit, applied to Martin White, then and now a citizen of California, for a loan of $12,000, to enable him to assert and maintain his rights in said suit, and offered to secure the payment of the same by an assignment of all his right, title, and interest in the property involved therein, to the plaintiff, in trust for said White. Thereupon, a contract was duly made and signed by said Elliott and White, which in effect recites that a controversy exists between Elliott and Holladay and others, concerning Elliott's "right" in the property, franchise, and rights of the Oregon Central Railroad Company, and that, "for the purpose of asserting and maintaining his rights in said contro-

versy, said Elliott has borrowed from Martin White the sum of $12,-000 in gold coin of the United States, and has agreed to repay the same within one year from the date of the last installment thereof, as hereinafter provided, (and within two years from the date hereof, whether the last installment shall be demanded by said Elliott within one year from the date hereof or not,) with interest on each installment from the date of the advance thereof at the rate of 10 per centum per annum." The agreement continues, that, in consideration of the premises, "Elliott has granted to White the option," to be exercised within 60 days after Elliott shall obtain possession of said property, "and notified White thereof," to take in lieu of the repayment of said loan one-half of all the property recovered by said Elliott, less 1,000,-000 of the bonds of the Oregon Central Company reserved for the use of the latter, and not exceeding $100,000 of the same for his attorney. "And to secure the performance of this agreement on his part, and to secure the payment of any additional advances not exceeding $13,000 that he may obtain from said White or other parties, said Elliott has assigned and conveyed in trust to George C. Hickox all his right and title, interest and claim, in and to the property aforesaid." "And in consideration of the agreement and acts of said Elliott, said White has agreed to loan to said Elliott said sum of $12,000 in gold coin of the United States, and to advance the same upon his demand in installments from time to time, as the same shall be required, upon the terms aforesaid." See *Hickox* v. *Elliott*, 10 Sawy. 417, S. C. 22 Fed. Rep. 14, 15, where this agreement is set out in full.

In pursuance of this agreement, Elliott, on February 13, 1874, executed and delivered to the plaintiff the following sale and assignment:

"In consideration of the sum of $12,000 in gold coin of the United States to me paid, and other valuable considerations, I, S. G. Elliott, of the commonwealth of Massachusetts, have granted, bargained, sold, and assigned, and by these presents do grant, bargain, sell, and assign, unto George C. Hickox, of the city and county of San Francisco, state of California, all my right, title, interest, and claim, both in law and equity, in and upon the stock, property, and assets of the Oregon Central Railroad Company of Salem, Or., and the Oregon & California Railroad Company, of Portland, Or., the firm of A. J. Cook & Co., and the firm of Ben Holladay & Co."

White claims and testifies that between the date of said agreement and March 25, 1879, he advanced to Elliott thereunder, or to others for him, the sum of $22,201.15. It is not questioned but that he advanced this sum, as stated in the account thereof attached to his deposition herein. But Elliott contends that White failed to advance him money as the agreement required, whereby the arrangement fell through and the assignment became inoperative; and that all sums paid out by White, as set forth in his account, after July 24, 1874, were so paid without his authority or consent, for which he is not liable. This contention is based on the assumption that White un-

dertook to advance Elliott not exceeding $25,000, when and as he might require or demand it.   But the truth is, White never undertook anything of the kind.   Taking this agreement and assignment together, and reading them by the light of the surrounding circumstances, it is evident that White did not undertake absolutely to advance Elliott more than $12,000, and only so much of that amount as might be necessary, from time to time, to enable the latter to properly carry on the controversy with his partners, which was expected to be brought to an end within the coming year, and that any additional advance that Elliott might obtain from White or other persons, not exceeding $13,000, should be equally secured by this assignment; but White did not undertake to furnish any portion of said additional advance.

Elliott admits that prior to July 2, 1874, and scarcely five months from the date of the contract, White had advanced him $8,592.50, the larger portion of which appears to have been applied to the former's private use, and not to the expense of the litigation with Holladay & Co.   But the evidence shows that by July 14, 1874, there was advanced to Elliott by White $11,718.50, and that on August 18th thereafter the latter paid Domnett a note of $363, which he had accepted for the former, in the February preceding, making the sum thus advanced $12,082.25, or $82.25 in excess of the sum stipulated.

On April 29, 1874, when over $7,000 had been advanced to Elliott, he drew on White from Portland in favor of himself for $500, and the defendant Effinger, who was his attorney, for $1,500.   On May 6th these drafts were protested for non-payment, and three days afterwards White wrote Elliott, rebuking him sharply for drawing on him for such sums or at all, after he had been advised not to draw on him for a dollar.   The letter was put in evidence by Elliott.   In the course of it White says if you need some small amounts "for incidental uses in the suit," write and let me know, and I will send my check therefor.   "I have already let you have enough to meet all coming [current] expenses, had it been applied to that purpose; in fact, I have advanced it twice as fast as I expected to, when I began."   I would be glad to furnish the $1,500 for Mr. Effinger.   "I have no doubt he needs the money, but under the circumstances I cannot see any way to let him have it at present."   With this letter White sent Elliott his check for $250 "to defray incidental expenses."

On July 24, 1874, Elliott being in San Francisco, and in need as usual, drew on White in favor of Johnson & Co. for the sums of $325 and $1,575, and the defendant Effinger for the sum of $600, which sums White declined to pay, as he told Elliott he would before the drafts were drawn.

Thereafter, Elliott testifies that he considered the arrangement with White at an end, and the assignment inoperative.

The only item in White's account of the $12,000 advanced to Ellictt,

now disputed by the latter, is the $2,465 paid by the former to discharge a debt of Elliott's of that amount secured by a mortgage on the property assigned to the plaintiff, as a security for White, and called the Mackey-Toomey mortgage. It is reasonable to suppose that when White agreed to advance $12,000 on the security of this assignment, that for his own protection he would require or provide that a prior mortgage thereon for not less than $2,000 should be taken up or satisfied out of that sum. And the evidence is very satisfactory that such was the distinct understanding of the parties to this arrangement.

On July 1st the defendants Elliott and Effinger were in San Francisco, the latter having in his possession this mortgage for Mr. Toomey, who was anxious to realize on it. White, having knowledge of these facts, and being about to go to Nevada, to be absent some time, on the next day deposited with Mr. R. P. Clement, the attorney for Elliott, $3,400, that being the remainder of the $12,000 yet unadvanced; and informed Elliott of the fact, and told him to take Effinger to Clement the next day, and have the mortgage paid, and receive the balance of the money. But Elliott tried to effect an arrangement by which the mortgage could be satisfied, and the debt otherwise secured, so that he could draw the full amount deposited with Clement; and, being unable to do this, he drew from Clement, on July 3d, $650, and the 13th and 14th, $200, leaving only $2,550 for the payment of the mortgage, whereon $2,645 was then due; which sum White, on August 31st, thereafter paid to Effinger on Elliott's account.

From this it appears that although White had not advanced the full sum of $12,000 on April 29, 1874, still Elliott had no right, under the contract, to draw on him for such sums as he did, or at all, because he had already received a much larger sum under the contract than he had any right to expect or demand, within the time which had elapsed since it was made. But really this is not an open question between these parties. From defendant Elliott's Exhibit 18, it appears that on September 25, 1874, White commenced a suit in the Twelfth district court, of San Francisco, to enjoin him from disposing of the property covered by the assignment to the plaintiff, in which he set out the agreement and assignment of February 10 and 13, 1874, and alleged that the advances then made thereunder amounted to $13,337.25. In an answer and cross-complaint, filed November 4, 1874, Elliott admitted the execution and existence of the agreement and assignment, but denied that White had advanced thereunder $13,337.25, but only $8,592.50; and alleges that he agreed to loan him $25,000, "as he might wish to use or draw the same;" and claimed $100,000 damages for the alleged failure to do so; and prayed that the agreement and assignment might be declared null and void; and on April 9, 1875, the court found that prior to the commencement of that action White had "lent and advanced"

Elliott $12,000, "as the same was required for the purpose mentioned in said agreement;" that White "never agreed to lend Elliott $25,-000, or any other or greater sum than $12,000; and that Elliott was not entitled to recover any damage in that action, or have either said agreement or assignment 'annulled;'" on which finding there was a judgment duly given by said court on July 13, 1875, which still remains in full force and effect.

By this finding and judgment the parties thereto are bound. The fact that White advanced Elliott $12,000, under the agreement, before September 25, 1874; that he never agreed to furnish him any more; and that the agreement and assignment were valid and binding instruments,—is *res judicata*, and no longer open to question. *Davis* v. *Brown*, 94 U. S. 428; *Cromwell* v. *County of Sac*, Id. 353; *Russell* v. *Place*, Id. 608; *Beloit* v. *Morgan*, 7 Wall. 619; *Outram* v. *Morewood*, 3 East, 346; *Sharon* v. *Hill*, 26 Fed. Rep. 344; *Oregonian Ry. Co.* v. *Oregon Ry. & Nav. Co.*, 27 Fed. Rep. 277.

The payments and advances made by White in and about the litigation with Holladay & Co., in excess of the sum of $12,000, are not necessarily secured by this assignment. Whatever Elliott *obtained* from him for that purpose is so secured. The advance or payment must have been made with the consent, express or implied, of Elliott; and the nature and necessity of the advance has much to do with the question of an implied consent. It is true, White had a direct interest in the subject of the litigation which may have justified him in incurring expense in protecting the same, and would have authorized him, under the circumstances, to apply to the court to be allowed to intervene and conduct the cause, as the real or principal party in interest. But even then his advances or expenses would not necessarily be secured by this assignment. There must have been an express or implied assent to the expenditure by Elliott.

On this view of the matter, I think the following items in White's account ought to be included in the sum for which the assignment is a security: September 16 and October 31, 1874, payments to Mr. Effinger, the leading counsel in the litigation with Holladay & Co., $500 and $1,500. Elliott had already drawn on White for these sums, and $100 more, for this very purpose; and although the latter did not then advance the money, he paid it to Effinger soon after, with Elliott's knowledge and apparent approbation. At least, no objection was made to the payment at the time. It was a matter of vital importance to the maintenance of Elliott's rights in the matters then in controversy; and, in the absence of any act or word to the contrary, his assent to an act so well calculated to benefit himself ought to be presumed. September 3 and October 1 and 12, 1875, payments to Moreland, referee, $20, $20, and $600, the amount due from Elliott for fees and charges. These payments were absolutely necessary to get the report of the referee before the court. No objection appears to have been made at the time, and Elliott's assent

may be presumed. September 20 and November 25, 1879, payments for printing briefs in San Francisco, and expressage to Portland, $234.60 and $23. This brief was prepared and printed in San Francisco, under the direction of Elliott, and the charges paid by White were for his benefit and with his implied assent. Altogether, these items make the sum of $14,979.85, for which this assignment is a security, and for the amount of which, with interest, the plaintiff is the assignee of the judgment against Ben Holladay, in trust for White, and entitled to maintain this suit for its enforcement. *Hickox* v. *Elliott*, 10 Sawy. 422; S. C. 22 Fed. Rep. 17.

Averaging the periods during which these four sums were advanced, and adding interest thereon from that time to this, at the rate of 10 per centum per annum, gives the whole amount for which the assignment is security as follows: Interest on $12,082.25, from April 15, 1879, $14,699.85; interest on $2,000, from October 1, 1874, $2,422.22; interest on $640, from September 15, 1875, $778.60; interest on $257.60, from March 15, 1879, $323.51; total principal, $14,979.85; total interest, $18,224.17; whole amount of claim, $33,204.02. Of the remaining $7,221.30 of the gross amount ($22,201.15) advanced and paid by White in and about this litigation, nearly $5,000 went to L. L. Bullock.

Mr. Bullock was in the employ of Elliott, in the litigation with Holladay & Co., as what may be called an "outside man," when White made the arrangement with Elliott to advance him money. Thereafter he was paid a monthly stipend much of the time, down to the spring of 1879. · I think the payments made to him after July, 1874, and particularly after the suit commenced by White against Elliott, in September of that year, may be safely regarded as having been made for services rendered White, if any one, although they may have been of benefit to Elliott as well. At least, there is nothing in the nature of the services, or the necessity for them, so far as appears, which justifies the conclusion that Elliott assented to the payments being made on his account.

On the hearing of the demurrer to this bill it was claimed for the defendant Elliott that the suit was barred by the lapse of time, and that the contract on which the money was advanced was void for champerty. The same defenses are now set up in his answer, and insisted on in the argument. But I see no reason to question the soundness of the conclusions then reached on these points. As was then said:

"It is immaterial whether an action could now be maintained by White against Elliott to recover this money or not. This is not such an action, but a suit brought by a person, claiming to be the assignee of a decree, to subject the property of the debtor therein to its payment and satisfaction. And it can be maintained, although the right of action against Elliott to recover the money in question is barred by lapse of time. The statute bars the remedy against Elliott in six years, but does not destroy the debt, and it still exists, for the purpose of enforcing any lien or pledge given to secure its payment.

*Quantock* v. *England*, 5 Burr. 2628; *Sparks* v. *Pico*, 1 McAllister, 497; *Myer* v. *Beal*, 5 Or. 130; *Goodwin* v. *Morris*, 9 Or. 322; 2 Pars. Cont. 379; Rapalje & L. Law Dict. 'Limitations.'" 22 Fed. Rep. 17.

This contract is claimed to be champertous, and therefore void, mainly on the option clause therein, whereby White was given the choice, within 60 days after Elliott had recovered possession of the railway property in question, and some millions of bonds of the company, and notified White thereof, of taking, in lieu of his money with interest, one-half thereof, less $1,100,000 of the bonds reserved for the private use of Elliott and his attorney. This clause was put into the contract at the suggestion of Elliott, to give the transaction and the subject thereof an air of importance and vastness to which it was not entitled. As was determined by the supreme court of the state in its judgment in *Holladay* v. *Elliott*, these bonds were issued by a corporation (the Oregon Central) that was a sham and a fraud from its inception, and were utterly worthless. But Elliott did not recover any railway property or bonds in the suit, and of course did not give notice to White to exercise his option. The contingency never happened on which this clause in the contract was to take effect. Nothing was ever claimed or done under it, and, practically, it is no part of the agreement. And, even admitting that the validity of the contract for the loan and repayment of the money is to be tried by the law of this state, I do not believe that the courts thereof will ever hold a contract champertous or void for maintenance, whereby a party not an attorney in the case, or at all, lends a man, in straitened circumstances, money to enable him to maintain his rights in the courts, against powerful and wealthy adversaries, on the promise to repay the same, with legal interest, secured by a mortgage on his interest in the subject of the litigation. If so, one man could not safely loan another money to defend an action brought to dispossess him of his farm or homestead.

In the brief of counsel for Elliott it is stated that the supreme court of the state, since the decision in this case on the demurrer to the bill, has held, in the unreported case of ———— v. *Sears*, "that champerty does exist in all its force in this state." It is also understood that the case is still pending on a rehearing. But I cannot, in a matter of this importance, act on any such informal and indefinite information concerning the judgment of that court. If not published in authentic form, a certified copy of the opinion should have been obtained from the clerk. However, I am still satisfied with the conclusion reached on the demurrer to the bill. It was then said, (10 Sawy. 430; 22 Fed. Rep. 23:) "This contract was made in California, and in contemplation of law was to be fulfilled or performed there." It is not only the *lex loci contractus*, but also the *lex loci solutionis*. "It has been held in that state since 1863 that there is no law there against any form of maintenance. *Mathewson* v. *Fitch*, 22 Cal. 93; *Hoffman* v. *Vallejo*, 45 Cal. 566. And the contract being

valid there, is valid here. Story, Const. Law, §§ 242, (1,) 279, 280."

And on the point, now urged again, that security was taken for the performance of the contract on property in Oregon, which makes it a contract to be performed here, and therefore its validity is to be tested by the laws of this state, it was said: "The authorities are uniformly otherwise." Story, Const. Law, § 287; *De Wolf* v. *Johnson*, 10 Wheat. 367. In the latter case Mr. Justice JOHNSON, speaking for the court, says:

"Taking foreign security does not necessarily draw after it the consequence that the contract is to be fulfilled when the security is taken. The legal fulfillment of a contract of loan, on the part of the borrower, is repayment of the money; and the security given is but the means of securing what he has contracted for, which, in the eye of the law, is to pay where he borrows, unless another place of payment be expressly designated by the contract."

In support of his argument, counsel for Elliott now cites Whart. Const. Law, §§ 402, 509–511, and *Parsons* v. *Trask*, 7 Gray, 473. The first citation from Wharton is only to the effect that the mode of payment is determined by the law of the place of payment, and that the latter is inferred from the facts. In the other three sections the question is discussed as to what determines the validity of a contract to pay interest, in which the learned writer truly says: "This question has been frequently litigated in the United States, and with results which, on their face, are irreconcilable." But neither of them bear on the question whether the validity of this contract, as to champerty, is to be determined by the law of California or Oregon. But, at section 403, Wharton, after stating that so far as performance is concerned, where the law of the place of solemnization of a contract conflicts with that of the place of performance, the latter controls; and that the validity of a mortgage depends on the law of the place where the thing exists, because there alone payment can be enforced,—says, at note 4: "But this is otherwise when a foreign mortgage is taken as collateral security merely, in which case the place of performance is the place of the payment of the principal bond;" citing the case of *De Wolf* v. *Johnson, supra.* In *Parsons* v. *Trask* it was merely decided that a contract made in a foreign country, by which an adult person bound herself to serve a citizen of the United States for five years, for $10, and board, lodging, and clothes, without specifying the nature or extent of the service, or the place of performance, even if valid where made, gave no right to the service in Massachusetts, because contrary to the laws and policy of that commonwealth.

But the question here is, where was this contract—this agreement to loan and repay this money—to be performed? If it was to be performed here, then the law of this state as to champerty may apply; otherwise not. The contract was executed in California, and the money loaned there, and the only reasonable inference from the facts is that the repayment was to be made there also. Both par-

ties lived in that state. There was nothing in the agreement to the contrary, nor anything in the situation or circumstances of the parties, present or prospective, that pointed in any other direction. Nor does the fact that collateral security was taken for such repayment on property in Oregon change its character in this respect. On the contrary, such security, as a mere incident of the debt, is so far valid or not according to the law of the place where the loan was made and to be repaid.

Another point is now first made, by counsel for Elliott, on section 161 of the Penal Code of California, which makes it a misdemeanor for an attorney to directly or indirectly buy any evidence of debt or thing in action, with intent to bring suit thereon. It may be admitted that a contract of sale or assignment, the making of which involves the commission of a misdemeanor, is impliedly prohibited and void. The agreement by which the money was loaned, and repayment promised, does not come within this section. The transaction, so far, was not a purchase of anything, but a loan. Nor does the section effect the sale or assignment to Hickox; because whatever passed by the same was obtained, not with intent to bring suit thereon,—to stir up strife,—but to defend one already pending. Nor were Hickox or White attorneys at the time of the transaction. The former never was an attorney. White was admitted to the bar in California in 1859, and in 1864 quit the practice on account of his health, and has been engaged in mines and mining ever since. Admitting, then, that White indirectly acquired whatever Hickox took in trust for him by the assignment, I do not think, on the facts, he was an attorney, within the meaning of the statute.

From the evidence it appears that the defendant Effinger was retained by Elliott in the case of *Holladay* v. *Elliott* in the fall of 1872. Thereafter, on December 1st, Elliott agreed to pay him $400 a month to act as his attorney until the termination of the controversy. By November 4, 1874, he had received from Elliott $1,450, and from White, on the latter's account, $2,000,—in all, $3,450. The suit dragged along for reasons not always within the control of Elliott, and still less of his attorney, and was not finally decided until 1879, when Effinger filed a notice of lien on the judgment, in pursuance of the statute, (Code Civil Proc. § 1012, sub. 4,) for the sum of $31,800, the amount of his compensation, reckoned at $400 per month, from December 1, 1872, to the date of the decree, less the sum of $3,450, received thereon, as above stated.

I do not think, under the circumstances, that this contract ought to be considered in force after 1874. Shortly before White advanced him the $2,000, Mr. Effinger, seeing the difficulties and delays in which Elliott was involved, wrote the former, offering to take $3,000 in addition to what he had already received, in full of his services to date, and such other and further compensation at the end of the litigation as might be considered reasonable, under the circumstances.

On this suggestion, White seems to have advanced the $2,000, which Effinger tacitly accepted, and thereafter looked to what might be obtained in the suit as the measure and means of any further compensation. Certainly it was never in the contemplation of the parties that this large compensation was running on from month to month, and year to year, while the suit was much of the time at a stand-still.

Effinger testifies that when judgment was obtained in the supreme court he purposed to apportion it between White, Elliott, and himself; but the latter immediately repudiated his claim and White's also; whereupon, as a protection for both himself and White, he fell back on his contract, and filed the notice of lien accordingly. And the controversy between these two is now, apparently, a friendly one, and may be adjusted by them irrespective of the action of this court. An unconditional fee of $5,000, promptly paid or secured, would, in my judgment, be a reasonable compensation for Mr. Effinger's services. But if the compensation was wholly contingent on success,— dependent on making the money out of the litigation,—$10,000 would not be an unreasonable fee. After 1874, Effinger's compensation was practically contingent, not only on getting a decree, but in realizing on it. This delay and risk must be considered in fixing the amount of this contingent compensation. In addition to the $3,450 he received prior to 1875, I will allow him the sum of $5,000, with legal interest from August 15, 1879, the date of the judgment, which amounts to $7,871.85.

The defendant Joseph Holladay states in his answer that he has "no knowledge, information, remembrance, or belief" as to the alleged contract and assignment, or the payment of any money thereunder by White, "wherefore he denies" the same. On the hearing he claimed the benefit of this denial as being evidence against the existence of such writings and the making of such payments. This allegation is a motley of code and equity pleading, but not proper under either. The Code does allow a defendant to controvert an allegation in the complaint by denying "any knowledge or information thereof sufficient to form a belief," but not on that account to deny the allegation itself. In equity a defendant who has no knowledge, information, or belief concerning the matter of an allegation should say so; and this is sufficient to put the plaintiff on the proof thereof. But such an answer is not evidence that requires at least one witness and corroborating circumstances to overcome. It is a mere negation, and proves nothing; and the addition, "wherefore he denies the same," amounts to nothing except to stultify the defendant; for how can a party truthfully deny an allegation of which he has just affirmed he has not even a belief. *Clark* v. *Van Riemsdyk*, 9 Cranch, 160; *Brooks* v. *Byam*, 1 Story, 301; *Dulilh* v. *Coursault*, 5 Cranch, C. C. 351.

At the close of the argument, counsel for Holladay also filed a motion to suppress the copies of the agreement and assignment, marked

in the margin, respectively, Exhibits "A" and "B," "GEORGE T. KNOX, Notary Public," and attached to the commission on which the depositions of the plaintiff and Martin White were taken. Both witnesses were asked about the contract and assignment. White, who was examined first, after answering that he had not the originals in his possession, added: "But I hereunto attach a certified copy" of said agreement and assignment, marked Exhibits "A" and "B." Hickox testified that the original contract and assignment were in his possession, and spoke as if he had them there in the presence of the commissioner, and added: "Under advice, I prefer to retain" them, "but a certified copy is attached hereto;" and, in the case of the assignment, he gave the place, book, and page of its record in Oregon.

There is but one Exhibit A and B attached to the commission, and that is doubtless the one to which both witnesses refer, and which was probably furnished by Hickox. They are true copies of. the agreement and assignment mentioned in the bill, and set out in the pleadings, in the case of *White* v. *Elliott*, and are doubtless what they purport to be,—true copies of the original writings in the possession of Hickox. Attached to each exhibit is the certificate of Edward Chattin, a notary public and commissioner for Oregon, to the effect that he had compared it with the original in the possession of Hickox, and that it was a true copy thereof.

Had the officer who took these depositions done so in due form of law, it would appear therefrom that the witness produced the original writings before him, and identified them; but, not desiring to give up the possession, he allowed the commissioner to take copies of them, which the latter attached to the commission, with his certificate that they were true copies of the original writings produced by the witness, and referred to in his testimony. *Dundee, etc., Co.* v. *Cooper*, 26 Fed. Rep. 665. Discarding the certificate of Chattin, who was a mere volunteer, and without authority in the premises, it does appear, at least inferentially, that the witness Hickox, in whose custody the original writings then were, produced them before the commissioner, and furnished him with what he testified were true copies of the same; and that the commissioner, either on the strength of that statement or his own examination, and it may be on both, indorsed said copies as the Exhibits A and B referred to in the testimony of White and Hickox, and attached them as such to the commission, with the depositions. That all this is technically insufficient, for lack of an express certicate by the commissioner that he had compared the alleged copies with the originals, and found them correct, may be admitted. But the objection is one that cannot be made at the hearing. It should have been made by a motion to suppress before the cause was set for hearing, when, if allowed, the mistake might have been corrected by retaking the depositions. When cause is set for hearing all technical objections to the reading of

the testimony on file are waived. *York Co.* v. *Central R. R.*, 3 Wall. 113; *Blackburn* v. *Crawfords*, Id. 191. See rules 27 and 28 of this court.

The answer of Holladay also contains an allegation in bar of this suit, to the effect that on November 7, 1883, and prior to the commencement thereof, the circuit court of the state for the county of Multnomah, in a suit then pending therein between Ben Holladay and Joseph Holladay, appointed a receiver of all the property mentioned in the bill herein, who is now in possession of the same as such receiver, which suit is still pending in said court. In support of this defense counsel submit the proposition that while property is in the hands of a receiver appointed by a court, no other court can acquire or take jurisdiction of a suit concerning such property, and cites a number of authorities in support thereof. But the proposition is altogether too broad, and is unsupported by the authorities cited. The receiver has no right in the property, but only the possession thereof. So long as that is not disturbed or questioned, parties may litigate in the same court, or elsewhere, questions concerning the ultimate right and title to the property. And therefore, notwithstanding the suit of *Holladay* v. *Holladay*, and the possession of the receiver therein, this court may take jurisdiction of a suit to set aside or postpone an alleged fraudulent conveyance of any of this property by Ben Holladay which hinders or delays the plaintiff in the enforcement of his judgment against said Holladay. In *Buck* v. *Colbath*, 3 Wall. 334, this question is examined by Mr. Justice MILLER, and the conclusion reached that the rule, among courts of concurrent jurisdiction, that the one which first obtains jurisdiction of a case has the exclusive right to decide every question arising therein, is subject to limitations. See, also, *Andrews* v. *Smith*, 19 Blatchf. 100; S. C. 5 Fed. Rep. 833.

The object of the suit in the state court between the two Holladays is not stated in the answer. But, in the nature of things, it cannot involve the matters in controversy here, and particularly the question of whether the plaintiff is entitled, as a creditor of Ben Holladay, to have these conveyances to Joseph Holladay set aside or postponed in favor of the judgment against the former. If this court should find that these conveyances were made with intent to hinder and delay the plaintiff in the collection of his demand, under such circumstance as makes the grantee therein a participant in the fraud, it would be its duty to decree that they be set aside or postponed in favor of the plaintiff's judgment. So far there would be no interference with the process of the state court or the possession of its receiver. Whether this court will stop there, and remit the plaintiff to his execution out of the same state court on his judgment therein, or provide for the sale of so much of the property by a master as may be sufficient to satisfy the same, together with the costs incurred in this court, will depend on circumstances. The latter course cannot

be pursued while the receiver is in charge, for that would necessarily interfere with his possession.

But so long as the plaintiff's right to enforce the judgment, and for the amount found due him, depends on a decree of this court, it is proper, and very convenient, that any disposition of the property in question to satisfy the same should be made on its process. And provision may be made in the decree that the sale shall be delayed until the receiver is discharged, or that the plaintiff may apply, on the footing of the decree, for an order of sale as soon as such discharge takes place.

The defendant Joseph Holladay also makes the further points against the plaintiff's right to relief: (1) The bill does not allege, and it is not shown, that there was any debt due from Ben Holladay to the plaintiff or his assignor prior to the date of the conveyances sought to be set aside, or any of them; (2) it does not appear that any execution has ever been issued on the decree against Holladay; and (3) there is no evidence that Holladay is insolvent and unable to satisfy the decree, except from the property in question.

The bill alleges that on November 5, 1869, and long prior to the date of any of the conveyances to Joseph Holladay, that a suit was commenced by Ben Holladay against Elliott, to dissolve the partnership of Holladay & Co., and for the settlement of its accounts, in which a final judgment was given in the supreme court dissolving said partnership as of the date of the commencement thereof, and that Elliott recover from said Holladay the sum of $21,919.46, and costs; and the answer of the defendant Holladay admits the allegation, word for word. The allegation might have been more specific, and stated that the sum recovered represented the indebtedness of Ben Holladay to his copartner Elliott at the commencement of the suit. But such is the necessary implication of the allegation as it stands. The indebtedness must have existed on November 5, 1869, from which time the court determined the partnership was dissolved, and the liability of its members to one another ascertained. And the proof to that effect is full and specific. By the decree of the supreme court it is found that the amount for which it is given was a debt, with the interest thereon, due Elliott from Holladay before the commencement of the suit.

Admitting that a mere judgment for money is not evidence of an earlier indebtedness, (Bump, Fraud. Conv. 557,) still it may appear from the findings of the court, or other proceedings in the case anterior to the judgment, how long the indebtedness existed prior thereto.

In *Hinde* v. *Longworth*, 11 Wheat. 211, which was a controversy between a party claiming under a voluntary deed of March, 1799, and one claiming under a money judgment of August, the same year, against the grantor therein, the court held that while the mere judgment did not show that the plaintiff therein was a creditor prior to the execution of the deed, without which he could not impugn the

same for fraud, (*Sexton* v. *Wheaton*, 8 Wheat. 242,) that the accounts on which the judgment was founded, and which were in the record, did show that the cause of action arose before the execution of the deed. See, also, *Goodnow* v. *Smith*, 97 Mass. 69.

The alleged fraudulent conveyances are about 20 in number, and appear to have been made from November, 1875, to April, 1879, while both the allegation and the proof are satisfactory that the indebtedness existed at and prior to November 5, 1869.

The issue of an execution, and the return of *nulla bona* thereon, is considered sufficient evidence of the insolvency of the judgment debtor, and that the judgment creditor is remediless at law. But it is not the only evidence of that fact, nor, in my judgment, always the best. The authorities are in apparent conflict on this question. Wait, Fraud. Conv. § 68; Bump, Fraud. Conv. 518–527. But where the diversity is not the result of local legislation, I think the apparent conflict arises from confounding creditors' bills to subject personal property to the satisfaction of a judgment with an ordinary bill in equity to set aside or postpone a conveyance of real property on which the plaintiff's judgment is, as against his debtor, a lien without an execution. In the latter case the right to maintain the suit is based on the unsatisfied judgment, the fraudulent conveyance, and the insolvency of the debtor; which latter fact may be proved by any competent evidence, as well as a return of *nulla bona* on an execution.

In *Hodges* v. *S. H. Mining Co.*, 9 Or. 200, it was held, in a suit against a stockholder of a corporation on a corporation debt, that the insolvency of the corporation might be shown as any other fact, without an execution or even a judgment against it.

*Terry* v. *Tubman*, 92 U. S. 156, was an action against a stockholder of a bank to recover the amount of certain unredeemed bills of the corporation. The court held that the insolvency of the bank might be shown otherwise than by a judgment and an unsatisfied execution.

*Case* v. *Beauregard*, 101 U. S. 688, was a creditors' bill against the members of an insolvent firm. The court said that a judgment and a fruitless execution are not the only evidence that a creditor has exhausted his legal remedy. "They are not the only possible means of proof. The necessity of resort to a court of equity may be made otherwise to appear."

In *McCalmont* v. *Lawrence*, 1 Blatchf. 232, Mr. Justice NELSON held that "chancery has jurisdiction, on a bill filed by a judgment creditor for relief against a conveyance of lands by his debtor, made with intent to defeat the judgment lien, or to hinder or delay satisfaction of the judgment, whether execution has been issued thereon or not." See Bump, Fraud. Conv. 523.

The insolvency of Ben Holladay is confessed. The bill alleges that he has no property in Oregon in his own name, and has not had since the date of said decree, out of which the same could be

satisfied by execution or other legal process against him; and that he is insolvent, and unable to pay said decree, except out of the property in question. This allegation is expressly admitted in the answer, except that the defendant says he "has neither knowledge, information, or remembrance sufficient to state whether or not the said Ben Holladay is insolvent, or unable in fact to pay the said decree except out of the property described in the bill of complaint." This allegation of want of knowledge is not evidence, and proves nothing. It is also noticeable that the defendant omits to state, as he should, whether he has any belief on the subject or not. But in his evidence he says, over and over again, that Ben Holladay was a ruined man financially when he left Oregon in the fall of 1877; that during his stay in Washington the following four years he allowed him five or six thousand dollars a year, out of the profits of the mill property, to keep him from starving. But the admission in the answer that Ben Holladay had no property in Oregon out of which said decree could be made by legal process, is sufficient. That is all a return of *nulla bona* on an execution would show, and either is sufficient evidence of insolvency for the purpose of this proceeding. It matters not how much property he may have out of this state, or beyond the process of its courts.

This disposes of the case, except as to the question of fact, did Ben Holladay make the conveyances and transfers in question with intention to hinder and delay his creditors, and did Joseph Holladay receive them with notice of such design, or good reason to believe the same? It is impossible for any unprejudiced mind to give any other than an affirmative answer to this question. It is not necessary to go into the evidence in detail. Suffice it to say that it appears from the defendant's own testimony, and the admitted facts of the case, that in January, 1873, Ben Holladay, being indebted to his brother Joseph in the sum of $100,000, gave him his note therefor; and on November 1, 1876, gave him another note for $163,345, in payment of the former note, and interest thereon at 12 per centum per annum, together with a third note for $4,500, given some time before. These notes have remained in the possession of Joseph Holladay, and no credits have been allowed or indorsed on them, although three valuable parcels of this real property, of not less than $50,000 in value, and 1,050 shares of the Oregon Transfer Company's stock, worth not less than $50,000 more, were conveyed and transferred to him between the giving of the first and last note. The real property was lots 1, 7, and 8, in block 47, in Portland, on which the Holladay residence is situated, the place called the Seaside House, and other considerable tracts of land in Clatsop county; and lots 6, 7, and 8, in block 23, in Couch's addition, together with sundry lettered blocks in said addition that were afterwards determined to belong to the Oregon & California Railway Company.

Afterwards, between November 25, 1876, and April, 1879, sundry

conveyances and transfers of property belonging to Ben Holladay were made to the defendant, namely: Shares of stock: 1,195 in the Portland Street Railway Company, 5,331 in the Wallamet Real-estate Company, 675 in the Wallamet Steam-mills Lumber & Manufacturing Company; furniture and stores at the Holladay residence; furniture, stock, and farming implements at the Seaside House; the undivided half of the furniture in the Clarendon Hotel; Sam Smith's notes for over $11,000, secured by mortgage on lot 2, in block 47; mortgage on the Simpson farm, in Polk county, —afterwards foreclosed and bought in; the undivided $\frac{1}{2}$ of the S. $\frac{1}{2}$ of block 23, in Couch's addition, (April, 1877,) on which was built the Clarendon Hotel; blocks 20 and 37, in Wheeler's addition to East Portland; the Cornelius farm, in Washington county; and 9,995 shares of the stock of the Oregon Real-estate Company.

The defendant contends that he did not receive this last stock from Ben Holladay, but that he bought it from the Bank of California for $34,000, to whom the former had pledged it as collateral security for a loan of probably not less than $25,000. But the fact is admitted that the payment was made out of moneys derived from the property and business transferred to him by his brother, and mainly out of the earnings of the transfer company. The plaintiff alleges that this property, when conveyed to the defendant, was worth $225,-000, and was worth at the commencement of this suit $500,000. In his answer the defendant says the property was not worth over $100,-000 when he received it, and that it is now not worth over $400,000. My conclusion is that the allegation in the bill on this point is substantially correct.

Nothing passed between the brothers at the time these conveyances were made as to their purpose or object. Joseph never asked for any of them, and Ben never told him why he made them. And the only conversation that ever passed between them on the subject, according to the former's testimony, is that, as his brother was about to leave the state in the fall of 1877, he went to his house, when the former said to him, without solicitation or explanation: "All this property belongs to you, and no power on earth can take it away from you." And he insists that he received it silently, but in "good faith," in payment of the debt then due him. The various properties remained in the hands and under the management of the persons in charge before the transfers were made, and the rents and profits of the mill and hotel, so far as they could be spared from the payment of debts, charges, and taxes, were largely transmitted to Ben Holladay, at Washington.

The defendant admits that he consented that the manager of the mill, Mr. George Weidler, might send his brother five or six thousand dollars a year to keep him from starving while in Washington prosecuting his Indian spoliation claim; and says that he has since learned that Weidler let him have not less than $75,000 during this time,

without his knowledge. And the fact appears to be, as this statement tends to show, that Joseph Holladay was a mere figure-head for this property, and knew very little about its management or condition. Ben Holladay's actual and trusted representative was Weidler, who managed his affairs, using Joseph Holladay's name as ostensible owner whenever necessary.

In the spring of 1879 the defendant was in Washington, and, being in need of money, applied to his brother for $1,000, which was refused for want of means. Thereupon he wrote Ben Holladay a letter, which is in evidence. After stating the request and refusal, he writes in substance: "You have just made $15,000 on the sale of O. & C. bonds, and yet refuse me $1,000, when you know I have not a dollar on earth, but have let you have every dollar I had on earth fifteen years ago." When the decree was given in the supreme court in favor of Elliott in 1879, the personal property at the Seaside House, and in the Holladay residence, was immediately transferred to the defendant by the agent of Ben Holladay, to prevent its seizure on execution. When the bills of sale were presented to him he appeared to apprehend the purpose of the transaction, and said it was no use,—the judgment would hold the property; but, on being assured by the agent, on the authority of a prominent lawyer, that nothing but an execution would prevent the transfer of personal property, he acquiesced and took the bills.

And lastly, in his answer in *Holladay* v. *Holladay*, which appears from the evidence to be a suit to have these conveyances, which are absolute in form, declared to be mortgages, the defendant swore that these conveyances were delivered to him "secretly and fraudulently" by Ben Holladay, "with the fraudulent intent" on his part "to cover up and conceal from his creditors" said property, and "in the fraudulent hope and expectation" that the defendant "would support him therefrom, and would fraudulently join and assist him in purchasing from his creditors their said claims and debts for a small percentage of their face value, and force them to compromise the same, and would thereafter reconvey the remainder of the property to him;" and for fear the creditors of Ben Holladay might have the defendant examined on oath concerning said conveyances, "said understanding and expectations were not put in the form of words or in writing," but Ben Holladay "verbally said to the defendant, in November, 1877, and divers other times, that said lands and personal property belonged to and were the property of this defendant." This is a full and frank confession of the fraudulent intent of the grantor in these conveyances, and the knowledge and acquiescence, if not the active participation, of the defendant therein.

After a careful consideration of all the facts, in my judgment, the best construction that can be put on these transactions is this: The conveyances and transfers were made by Ben Holladay to Joseph Holladay, not in payment or satisfaction of his debt, but to secure it

for the time being, and until there was a change for the better in his circumstances, which he probably hoped might soon come through the action of congress on his Indian spoliation claim; and, in the mean time, to thereby prevent and delay his other creditors from collecting their debts at what he might consider a sacrifice of a large property, which, in the near future, would greatly enhance in value. However, the law of the case is clear. The conveyances are void as to existing creditors, both as to the grantor and grantee.

Section 51 of chapter 6, (Laws Or. 523,) which is substantially chapter 5 of 13 Eliz., provides, among other things, that every conveyance of any estate in lands, or goods or things in action, "made with intent to hinder, delay, or defraud creditors, or other persons, of their lawful  *  *  *  debts or demands,  *  *  *  as against the persons so hindered, delayed, or defrauded, shall be void." It is not necessary that the grantee in a deed made to hinder or delay creditors should have actual knowledge of the debtor's intent to make it void. A knowledge of facts sufficient to excite the suspicions of a prudent man, and put him on inquiry, amounts to notice, and is equivalent, in contemplation of law, to actual knowledge, and makes the grantee a party to the wrong. *Clements* v. *Moore*, 6 Wall. 312; *Bartles* v. *Gibson*, 17 Fed. Rep. 293; Bump, Fraud. Conv. 200. And the grantee in such a conveyance cannot avoid the effect of these criminative circumstances by insisting that he acted in good faith,— *res ipsa loquitor*; for good faith, in such case, cannot co-exist with notice of the wrongful intent of the grantor.

The conveyances of real property being void as to the plaintiff, he is entitled to have them so declared and set aside, so far as may be necessary to collect thereout the judgment against Ben Holladay; and it is so ordered. The plaintiff is also entitled to costs against the defendants Elliott and Joseph Holladay; but whether they shall be taxed against them *in solido* or severally, and, if the latter, for what amounts, and whether the decree shall leave the plaintiff to enforce his decree by execution from the state court, or by the process and under the direction of this court, will be determined at the settlement of the decree, on which counsel may be heard.

NOTE.

1. CHAMPERTY. Champerty is an aggravated species of maintenance. McIntyre v. Thompson, 10 Fed. Rep. 532.

A mere agreement for a contingent fee is not champertous. To constitute champerty there must be an agreement on the part of the champertor to carry on the party's suit at his own expense, as well as for a share of the thing or money to be received. Jewel v. Neidy, (Iowa,) 16 N. W. Rep. 141.

Agreement to prosecute a claim for a stipulated amount of the proceeds, with full power to compromise as shall be thought best, is not a champertous agreement. Jeffries v. Mutual Life Ins. Co. of N. Y., 4 Sup. Ct. Rep. 8.

In Vimont v. Chicago & N. W. Ry. Co., (Iowa,) 21 N. W. Rep. 9, J., who was injured by the negligence of defendant railroad company, assigned his claim for damages to V., and V. executed the following agreement: "In consideration of the assignment to me by J. of his claim for damages against the Chicago & Northwestern Railway Company, resulting to him by reason of an injury received by him on or about the thirty-first day of August, 1881, on said railway, I hereby agree to dispose of the entire amount

realized on said claim as follows: For my own compensation in and about the prosecution of said claim, and for the use of any advances of money I may make, I am to retain thereof the sum of fifty dollars; I am also to retain all sums of money that I may advance in the prosecution of said claim; next, I agree to pay out of the proceeds of said recovery the reasonable fee of the attorneys and agents employed to prosecute said claim, or such fee therefor as may be agreed upon, if any agreement for a specific amount shall be agreed upon, and the balance of said recovery I agree to pay to the said J." It was held that the cause of action was assignable; that the assignment and agreement did not constitute barratry, champerty, or maintenance; and that V. was entitled to maintain an action for damages against the railway company in his own name.

A contract between an attorney and his client that the attorney shall prosecute a claim at his own cost, for a share of the recovery, is champertous and illegal. Martin v. Clarke, 8 R. I. 389.

Where an attorney was employed to bring an action, the client agreeing to give or allow and pay him the first $50 collected by him therein, held not champertous. Scott v. Harmon, 109 Mass. 237.

An agreement by which a defendant in attachment assigns to his attorney the property attached, in consideration of his services in the suit, and in prosecuting a contemplated action of damages on account of the attachment, stipulating for his own diligence in the attachment suit, and giving the attorney the entire management and control, is not void for champerty or maintenance. Ware's Adm'r v. Russell, 70 Ala. 174.

In Stanton v. Haskin, 1 McArthur, 558, R. & S., attorneys at law, agreed to conduct a suit in chancery for the recovery of lands claimed by H. and wife, who agreed to give them one-third of whatever land or money might be received. A decree was obtained in favor of H. and wife for the lands, and also for the rents and profits. In a suit to enforce the agreement for an undivided third of the land so recovered, the court held that the contract was champertous and therefore void.

The New York Code contemplates a case in which the action might never have been brought but for the inducement of a loan or advance offered by the attorney, and where the latter, by officious interference, procures the suit to be brought, and obtained a retainer in it. Fowler v. Callan, (N. Y.) 7 N. E. Rep. 169.

For a full discussion of the general subject of champerty, see Courtright v. Burnes, 13 Fed. Rep. 317, and note by Judge SEYMOUR D. THOMPSON, 323-329.

2. FRAUDULENT CONVEYANCE—KNOWLEDGE OF GRANTEE. For an exhaustive discussion of the question of fraudulent conveyance, and therein of the knowledge of the grantee, see Platt v. Schreyer, 25 Fed. Rep. 83, and note, 87-94.