### MEXICAN NAT. COAL, TIMBER & IRON CO. et al. v. FRANK et al.

#### (Circuit Court, S. D. Texas, Laredo Division. April 23, 1907.)

#### No. 1.

1. CHAMPERTY AND MAINTENANCE—NATURE OF CONTRACT.

Where a complainant and an intervening petitioner had a common interest in the subject-matter of a suit, an agreement between them, by which the intervener agreed to bring and prosecute the suit at its own expense, and that complainant should have a certain share of the net recovery, is not champertous or illegal.

2. PRINCIPAL AND AGENT—POWERS OF AGENT—CONSTRUCTION OF WRITTEN AUTHORITY.

A power of attorney, and a letter written contemporaneously by the principal to the agent inclosing the same, are to be considered as constituent parts of the same instrument, and are to receive the same construction as though embodied with one and the same paper; and, where

in such case the agent was authorized by the letter to use the power of attorney to make a transfer of property only on certain terms, the power of the agent was strictly limited by such instructions, and he could not convey his principal's interest on other or different terms to one who had knowledge of such limitation.

3. CORPORATIONS—UNAUTHORIZED ACTS OF AGENT—RATIFICATION.

A letter written by an officer of a corporation, expressing his personal approval of an unauthorized act done on behalf of the corporation by an agent, cannot bind the corporation as a ratification.

4. EQUITY—GROUNDS FOR EQUITABLE RELIEF—LACHES.

The owners of certain land leased the right to mine coal thereon, for a term of 50 years, to one as trustee; he stipulating to furnish the capital and develop and carry on the mining, to pay the lessors a share of the net profits, and, if the enterprise should prove unprofitable, to have the right to remove the machinery and buildings placed on the land. Others, among whom was complainant, became interested as beneficiaries under the lease. After prosecuting the enterprise for more than 10 years unsuccessfully, and with continuous loss, the trustee, with the consent of the lessors, executed to them a formal abandonment of the lease on behalf of all the beneficiaries whom he represented as trustee. All assented to and ratified the abandonment, except the complainant, whose agent also engaged that it would assign its interest to the lessors; but it did not do so, and nearly five years afterward brought suit to annul all the transfers on the ground of fraud and establish a right in the property under the lease. No fraud was shown, and it appeared that the trustee received no consideration for the abandonment. *Held*, that complainant could not maintain the suit, especially after such delay and the acquiring of interests in the property by others.

5. EXECUTION—PROPERTY SUBJECT TO EXECUTION—INTEREST OF TENANT UNDER LEASE.

Under Rev. St. Tex. 1895, art. 3122, which provides that a tenant cannot sublet the leased premises without the landlord's consent, the interest of a lessee is not subject to forced sale under execution or attachments.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 21, Execution, § 83.]

6. LIMITATION OF ACTIONS—TEXAS STATUTE—SUIT FOR CANCELLATION OF CONVEYANCES.

Rev. St. Tex. 1895, art. 3358, prescribing a limitation of four years for actions "other than for the recovery of real estate," for which no limitation is otherwise prescribed, applies to a suit for the cancellation of instruments purporting to surrender a coal mining lease, even though as a result of such cancellaton complainant might recover possession of the land; and, while such statute does not govern in suits in equity in the federal courts, yet, where such a suit was brought more than four years after the execution of the instruments and the abandonment of work under the lease, the statute will be applied by analogy, and the suit held barred by laches.

In Equity.

Denman, Franklin & McGown, for complainant Mexican National Coal, Timber & Iron Company.

C. L. Bates and Duval West, for cross-complainant Studebaker Bros. Mfg. Co.

E. A. Atlee, Wm. Aubrey, and J. O. Terrell, for defendants.

BURNS, District Judge. The origin of the litigation between the parties to this suit is to be found in the contract following, to wit:

"Articles of agreement entered into this 25th day of May, A. D. 1881, between C. M. Macdonnell and Teresa Benavides, of the city of Laredo, county

of Webb, and state of Texas, of the first part, and A. C. Hunt, trustee, of the second part, witnesseth:

"The parties of the first part hereby let, lease, and demise unto the parties of the second part the right to mine coal or other minerals on all that tract of land in the county of Webb and state of Texas, known as the 'Santo Tomas' ranch fronting on the Rio Grande between El Arroya Santo Tomas and El Arroyo de la Llave with a depth of six leagues, reserving to themselves the use of the land for grazing and farming. To have and to hold the above described mining rights unto the parties of the second part for the full term and period of fifty years, upon the following terms and conditions, to wit: The said second parties promise and agree to furnish all the material, tools, implements, machinery, capital, and labor requisite and necessary for the working and development of any coal mine or mines that may be found on said land. (2) The second parties to have the exclusive privilege to mine coal or other minerals on said land during the continuance of said term, to have the privilege of taking sufficient wood, timber, rock, or any other material on said land for the purpose of said mining enterprise, and to have the right to erect and put up all necessary buildings or structures for carrying on the business of said mining enterprise, and in case said mining enterprise should not be successful, the second parties shall have the right to remove all engines, tools, machinery, buildings, and other fixtures. (3) The first parties shall be owners of a one-third part of said mining enterprise, and shall receive one-third of the net profits realized therefrom in the following proportions; that is to say, that C. M. Macdonnell is to have and receive three-fifths of said one-third, and Teresa Pisana Benavides is to have and receive two-fifths of said one-third. (4) One-fourth of the profits so accruing to the parties of the first part shall be applied to the payment of one-third of the capital invested in said mining enterprise by the parties of the second part; and the remaining three-fourths shall be paid over to the first parties as dividends or gains. (5) The second parties shall have the exclusive control, management, and direction of said mining enterprise. (6) The first parties shall be allowed at all reasonable hours to inspect the books and accounts of said mining enterprise. (7) An account shall be taken and dividends and losses declared every six months after the commencement of operation. (8) Interest shall not be charged against the first parties on their one-third unpaid capital, nor shall they be liable for any losses. (9) The second parties shall begin in good faith the execution and performance of their part of this agreement on or before the 15th day of May, A. D. 1881. (10) This agreement shall be in force from and after the 15th day of May, A. D. 1881. Upon a dissolution of said mining enterprise, the first parties shall be entitled to receive a pro rata share of the capital paid in by them. Said second parties obligate themselves to use all economy in the conduct and management of said mining enterprise.

"C. M. Macdonnell.

her<br>
"Teresa Pisana  X  De Benavides.<br>
mark.

"Alex. C. Hunt."

Complainant alleged: (1) That on March 6, 1897, the Mexican National Coal, Timber & Iron Company filed its bill and thereafter its amended and supplemental bills against A. B. Frank, as the administrator of Charles M. Macdonnell, Allan Macdonnell, and Mary Macdonnell, as the only heirs at law of Charles M. Macdonnell, deceased, Daniel Milmo, Albert Urbahn, Teresa Pisana De Benavides, Zaragoza Benavides, Jose Benavides, W. H. Mowry and his wife, Margarita B. Mowry (formerly Benavides), Natividad Herrera and his wife, Ester B. Herrera (formerly Benavides), William Anderson, D. T. Roy, Thomas T. Brewster, John H. Mangham, the Rio Grande Coal & Irrigation Company, Thomas Carmichael, Studebaker Bros.

Manufacturing Company, the New York Security & Trust Company, and the Rio Grande Coal Company, alleging that the lessee, Hunt, had, by instrument dated August 31, 1882, executed and delivered to W. J. Palmer a declaration of trust, so-called, whereby he declared that he held one-third of said mining lease in trust for said Palmer, and that said Palmer, by instrument dated September 1, 1882, had assigned his interest thereby acquired to the Mexican National Construction Company, and that, by instrument of May 1, 1884, said construction company had assigned to complainant its interest in the premises.

(2) That the lessor, C. M. Macdonnell, died September 23, 1888, leaving as his heirs at law defendants Mary and Allan Macdonnell; that said Allan Macdonnell was appointed administrator of the estate of said C. M. Macdonnell; that trustee Hunt took possession of the leased premises, furnished tools, etc., for the opening of coal mines on said tract of land, and was furnished by said Palmer, as agent for said Mexican National Construction Company, with $27,000 for that purpose; and that complainant was entitled, as assignee of said construction company, to recover said sum of money before any profits accruing from said mines should be divided among the parties interested.

(3) That Allan Macdonnell, representing the interests of the estate of C. M. Macdonnell and the other owners of the fee of said tract of land, through one James Luttrell, fraudulently and without consideration, procured from said Hunt, as trustee, an instrument, dated April 1, 1892, whereby the latter, acting in behalf of himself and the other beneficiaries of said lease, relinquished and abandoned to said representative and owners said lease and mining enterprise.

(4) That, notwithstanding it was recited in said instrument of relinquishment that said mining enterprise had been unprofitable, the contrary was the fact, and that neither the complainant nor the other beneficiaries named in said relinquishment were consulted by said Hunt, trustee, in regard to the making thereof, and neither of them authorized its execution or delivery.

(5) That March 12, 1892, for the purpose of empowering said Luttrell to dispose of its interest in said lease, and with the distinct understanding that thereby complainant was to realize in cash or its equivalent not less than $3,000, it executed and delivered to said Luttrell an instrument on its face an unconditional assignment of complainant's interest in said lease; that May 22, 1892, said Luttrell returned said instrument to complainant without having acted under or in pursuance thereof; that June 11, 1892, said Luttrell, in pursuance of a fraudulent contrivance between himself and the owners of said land, executed and delivered to Macdonnell an assignment of all complainant's interest in said lease, at the same time executing and delivering to said Macdonnell a personal guaranty, against any claim of the complainant to or for possession of, or to or for any interest in, said land and mining lease; that the owners of the land, immediately after said relinquishment, took possession of the mining property and the implements placed thereon by trustee Hunt, and October 4, 1892, executed and delivered to defendant William Anderson a lease of the mining privileges on said land for 20 years; that said Anderson organized a corporation under the name of the Minera Colliery Company,

to which Anderson conveyed his mining rights; that said colliery company executed a deed of trust on its interest in said mining lease to M. T. Cogley, as trustee; that said deed of trust was foreclosed by suit and at the foreclosure sale, and R. P. Walker purchased the same; that said Walker organized a corporation under the name of the Santo Tomas Coal Company and conveyed his interest in said property to said coal company; that said Walker and said coal company conveyed to defendant Thomas Carmichael said lease; that, while in the possession of said mining property, said Anderson contracted with the owners of the land for the purchase of the same, and executed a deed of trust thereon to secure the purchase money therefor.

(6) That said Anderson caused to be incorporated a corporation under the name of the Rio Grande Coal & Irrigation Company, and conveyed said land to said irrigation company; that said irrigation company issued bonds, and, to secure the same, conveyed the said land in trust to defendant New York Security & Trust Company; that defendants Milmo and Urbahn, December 1, 1896, purchased from defendant A. B. Frank, at that time administrator of the estate of C. M. Macdonnell, an undivided three-fourths interest in said mining property.

(7) That each of said mesne conveyances, from and under William Anderson and the administrator of said C. M. Macdonnell's estate, are evidenced by instruments of writing duly recorded, and that the several parties claiming thereunder took and held possession of said mining property and operated the mines thereon situated under, and, in pursuance of said conveyances, appropriated to their use the tools and implements placed on and used by trustee Hunt in connection with said mining property and took and received large sums of money, the proceeds of the coal mined on said property by them, respectively.

(8) Complainant prayed for relief as follows: (1) That the instrument of relinquishment by trustee Hunt, dated April, 1892, to the owners of the land, be set aside and declared fraudulent and void, and that said lease to said Anderson and the mesne conveyances, connecting defendant Carmichael and the Rio Grande Coal & Irrigation Company with the title of said Anderson and the owners of the land, be in like manner declared fraudulent and void; (2) that defendants be required to account for the coal taken from said property pending their possession and use thereof; (3) that the deed of trust of defendant security and trust company be declared of no validity; (4) that a trustee be appointed in place of trustee Hunt, who is alleged to have died prior to the institution of this suit; (5) that, pending the appointment of a trustee, a receiver be appointed; (6) that the alleged trust created by said lease contract of May 25, 1881, be established, and that the trustee appointed by the court have possession of the mines and mining property thereon situated and be empowered to operate said mines under said lease; (7) that the court establish by its decree the interests of the parties, respectively, in said mining lease and property; (8) that defendants be enjoined from receiving any money from the operation of the mines and from removing therefrom any property incident thereto; (9) for a discovery under oath.

On June 10, 1905, E. J. Palmer, John E. Lundstrum, Walter Hinchman, William A. Bell, and Thomas J. Fisher filed their bill of revivor in the cause, alleging that November 21, 1903, the charter of complainant expired by limitation, and that said parties were stockholders in part, and constituted the board of directors of complainant, and that by the laws of the state of Colorado, under which complainant was chartered, its board of directors, upon the expiration of its charter, became the trustees of the creditors and stockholders of complainant, and, as such, had power to settle and wind up the affairs of complainant. These parties prayed that the suit be revived, and that they be allowed to prosecute the same to final decree in behalf of themselves and the remaining stockholders of complainant.

August 4, 1897, defendant Studebaker Bros. Manufacturing Company filed its cross-bill, and thereafter its amended and supplemental cross-bills, against the remaining defendants in this suit, in which it alleged, in effect, the facts averred by complainant, and additionally: (a) That under the mining lease of May 25, 1881, A. C. Hunt became the owner of an undivided one-third beneficial interest in the mining property thereby conveyed. (b) That a suit was instituted by A. C. Hunt, trustee, October 8, 1888, against the owners of the land for the recovery of said mining property, and the interest vested in the lessees therein under the mining lease of May 25, 1881; that, at that time, said Hunt was insolvent, and for the purpose of placing his beneficial interest in said lease, etc., beyond the reach of his creditors, and particularly of cross-complainant, fraudulently alleged in the original petition filed in said suit that Asa H. Stearns, Albert C. Hunt, A. W. Wilcox, and George Sackett were the owners of said interest of said A. C. Hunt, trustee, in said property; that afterwards, under the same conditions, and for the same purpose, said Hunt, trustee, filed in said suit an amended petition, in which he alleged that Stearns, Wilcox, and Albert C. Hunt were the owners of his said one-third beneficial interest, and that said suit went to a final judgment January 20, 1890, upon said amended petition, and thereby said Wilcox, Stearns, and Albert C. Hunt recovered said one-third beneficial interest. (c) That April 1, 1892, in the instrument of relinquishment by A. C. Hunt, trustee, above referred to, said Hunt fraudulently and falsely stated that said Albert C. Hunt, Asa H. Stearns, and A. W. Wilcox owned said one-third interest in said mining property, and that said Albert C. Hunt, Stearns, and Wilcox set up a claim under said instrument to said one-third interest of said Alexander C. Hunt in said mining property, but that they never paid anything for said interest, and their claim was without consideration. (d) That in the year 1892, and prior to June 12th of that year, said Stearns, Wilcox, and Albert C. Hunt transferred their interest in said mining property to defendant Allan Macdonnell. (e) That November 28, 1891, cross-complainant brought suit against Alexander C. Hunt in the district court of Webb county, Tex., to recover a debt due to it for wagons, tools, and machinery, and that in said suit, by an attachment issued November 28, 1891, cross-complainant caused the said interest of said Hunt on the same day to be levied upon; that September 8, 1892, cross-complainant recovered

judgment in said suit for $6,622.34, with a decree foreclosing the lien of its attachment on said mining property, and that thereafter, to wit, November 1, 1892, at foreclosure sale had under said decree, cross-complainant purchased said interest of said Alexander C. Hunt in said mining property.

Cross-complainant prayed for a decree as follows: (1) Establishing a trust under said mining lease of May 25, 1881, in said mining property and determining the beneficiaries; (2) appointing a trustee; (3) establishing cross-complainant's rights to said one-third beneficial interest in said mining property, improvements, etc.; (4) that cross-complainant recover of defendants its said one-third interest in said mining property, etc., and have a writ of assistance to put it in possession of same; (5) that cross-complainant recover of defendants one-third of the value of all the coal taken from said mines since November 28, 1891, and all machinery, etc., taken possession of by defendants since said date, and that a master be appointed to ascertain the amount of said value; (6) that the relinquishment of April 1, 1892, executed by Alex. C. Hunt, and all the deeds, deeds of trust, and leases, made by and to defendants of said mines and mining property, improvements, etc., be declared fraudulent and be canceled; (7) that defendants be enjoined from pleading the statute of limitations against cross-complainant; (8) for a discovery not on oath, and pending this suit, for the appointment of a receiver.

June 10, 1905, cross-complainant filed a bill of revivor, alleging, substantially, the matters and things by W. J. Palmer, Walter Hinchman, John E. Lundstrum, William A. Bell, and Thomas J. Fisher in their bill of revivor set forth, and prayed that this suit might be further prosecuted for and in behalf of said new parties and cross-complainant.

Defendants demurred to the original, amended, and supplemental bills of complainant, and cross-complainant, respectively, for want of jurisdiction, etc. Defendants answered under oath, meeting by their answers the equities in the bill and amended and supplemental bills of the adverse parties, and pleading the bars of the statute of limitations of two, three, four, and five years, against the various causes of action asserted against them, laches on the part of the adverse parties in asserting their claims, the purchase of the leased property, and the making of improvements thereon without notice and in good faith and for value, the expenditure of large sums of money in good faith in the development and operation of the property, and that the adverse parties were and should be estopped by their acts and omissions in the premises from asserting their claims in this or any other court.

A portion of the defendants admitted that at one time Alexander C. Hunt, named as trustee in the mining lease of May 25, 1881, owned a one-third beneficial interest in the mining property by said instrument conveyed. Defendants Carmichael, Rio Grande Coal Company, Rio Grande Coal & Irrigation Company, T. T. Brewster, D. T. Roy, and others, by their amended answer, denied any knowledge of any interest of said Alexander C. Hunt in the premises in controversy, other than that evidenced by the instrument of lease itself.

It is urged upon the court with the vigor of logic that complainant

should not be permitted to further prosecute this suit, and that same should be dismissed, because of the undisputed evidence that same was brought in pursuance of an illegal, champertous, and improper agreement entered into between the Studebaker Bros. Manufacturing Company and complainant, whereby the said manufacturing company agreed to and did bring this suit in the name of complainant entirely at the expense of the said manufacturing company; the said complainant to receive one-half the net sum so realized without expense or liability in the prosecution thereof, and all costs and attorney's fees to be paid by the cross-complainant.

It is not deemed necessary to set forth the testimony in support of this contention. It is sufficient to say that the evidence of the president of the complainant corporation abundantly supports this statement, and that the same is without qualification or controversy. There is a line of decision holding, in effect, that it is the duty of a court to dismiss a suit when it affirmatively appears upon trial that the action is being prosecuted upon the character of agreement herein described, and that it is not a prerequisite thereto that a plea be filed to that end. On the other hand, many authorities hold to the rule that the making of an illegal and champertous contract can only be set up to avoid the agreement as between the parties thereto.

The agreement between the plaintiffs is not subject to the objection as made, for the reason that the record discloses that each had an equal or common interest in the assertion of title to the mining property, and so had prior to the agreement, and there is no such counterfeiting of the moral code as to place the parties in the category assigned them by the defendants. American & English Encyc. of Law, vol. 5, p. 820, § 3; Davies v. Stowell, 78 Wis. 336, 47 N. W. 370, 10 L. R. A 190; Goodspeed v. Fuller, 71 Am. Dec. 572, 46 Me. 141. The contract may be enforced in Texas. Bentinck v. Franklin, 38 Tex. 458; Stewart v. H. & T. C. Ry., 62 Tex. 246; Mercantile Trust Co. v. Tex. Pac. Ry. (C. C.) 51 Fed. 532; Ross v. City of Ft. Wayne, 64 Fed. 1007, 12 C. C. A. 627; Hickox v. Elliott and Others (C. C.) 27 Fed. 838.

If it be conceded that the complainant and the cross-complainant have a legal or equitable title to the premises in question entitling them to possession, then it follows, under the unbroken line of authorities in this state, that the several statutes of limitations invoked by the defendants are without avail, by reason of the fact that the five years' statute of limitations, relating to possession of property held by virtue of deed, or deeds, duly recorded, and payment of all taxes due upon the premises, was not complete as a bar at the time of the institution of this suit. The record discloses that the original owners of the land went into possession on the 11th of June, 1892, and the bill of complainant was filed on the 6th day of March, 1897. Therefore the adverse possession of the defendants, and those claiming under them, lacked a few months of meeting the statutory requirement.

Defendants further contend that the bill should be dismissed upon the ground that the plaintiffs herein have an adequate and complete remedy at law. This contention cannot be considered and acted upon

regardless of whether or not the court should be of the opinion that this is the correct view, by reason of the fact that this question was raised in the earlier stages of the pleadings in the appropriate manner, and the judge of the district in which the cause was pending passed upon the demurrers, raising this issue, adversely to the point now urged for consideration, and, under the terms of the legislative act creating the southern district of Texas, the discussion of the matter can serve no useful purpose, as the question was not reserved for future action or revision upon the part of the trial court. See act creating Southern district. Act March, 1902.

The complainant and cross-complainant under their allegations treat the several instruments of conveyance and lease as clouds upon their title, and seek a cancellation thereof. The pleadings further show that the claims asserted are of an equitable nature, and that defendants are in possession of the property. Defendants urge that, under the allegations of the bill, the alleged fraudulent grantor being dead, the cause should abate until his heirs are made parties. This view does not meet approval by reason of the fact that the children and heirs of the trustee named in the lease executed a special warranty deed to the original lessors, and this instrument is sufficient, under adjudicated cases, to pass the title then owned or subsequently acquired; and, further, their ancestor having made conveyance, they have no interest.

The plaintiffs herein are not entitled to an accounting for the profits, if any, since the defendants were repossessed of the mining property, and while there is a prayer therefor, yet in argument this relief, as an incident to the main issue, is not insisted upon, but the same is referred to as being waived. The testimony develops that the mining venture, under the management of Gov. Hunt, was not a success, and that the landowners, the original lessors, never received a single dollar as the result of the undertaking. The lessors, claiming that the contract was not being executed, took possession of the mines and operated the same for a short period, when the trustee filed suit for possession in the nature of trespass to try title in the district court of Webb county. In this suit the trustee joined as parties plaintiff the complainant herein and the beneficiaries, Wilcox, A. C. Hunt, Jr., and Asa H. Stearns, the two latter being his children, and, as the result of the litigation, recovered a judgment for possession. Benavides v. Hunt, 79 Tex. 383, 15 S. W. 396. Subsequently the said trustee filed suit against the owners and lessors, Macdonnell, Benavides, and others, for damages growing out of their wrongful and illegal trespass and operation, and for the value of the output of the mines.

In the meanwhile, suits were instituted by the Milmo National Bank, the Studebaker Bros. Manufacturing Company, and others against Gov. Hunt, upon which personal judgments were had and recovered. Thereafter Gov. Hunt absented himself from the state for some while, and during a visit to the city of Washington suffered a stroke of paralysis, seriously impairing his health; but there is no suggestion of any encroachment of the malady upon his mentality. From the record it satisfactorily appears that the project of mining for coal on the Rio Grande was not attended with success, and about

154 F.—15

this period in the history of the controversy, the Milmo National Bank sued out, upon its former judgment, a writ of garnishment against the "Santo Tomas Coal Company," being the mining property in question, then under the personal management of Dr. Wilcox, as the representative of the trustee, and on November 28, 1891, the Studebaker Bros. Manufacturing Company filed suit against Hunt in the district court of Webb county, and on the same day attached his interest, and on June 11, 1892, served citation upon him, and thereafter, having secured judgment for $6,622.34, and foreclosure of said attachment lien, became the purchaser at sheriff's sale on November 1, 1892.

After attachment, and prior to the said sale, Gov. Hunt, being desirous of surrendering the property and canceling the lease, did on June 11, 1892, execute and deliver a conveyance of all the property covered by the lease, and through his agent placed the owners Macdonnell and Benavides in full possession and control of the premises, and they, and those claiming under them, have been in possession and active development ever since said date. The parties named as beneficiaries by Gov. Hunt, in the suit instituted in the district court of Webb county, all joined in special warranty deeds conveying the premises back to the original lessors, save and except the complainant, and the testimony further discloses that said complainant attempted so to do, being moved thereto in order to aid Gov. Hunt to free himself from the engagement and expecting to realize therefrom the sum of $2,500 to $3,000. With this object in view, the said complainant passed its title to the property under what may be designated as an assignment of interest, as follows:

"New York, March 31, 1892.

"For value received the Mexican National Coal, Timber & Iron Company hereby sells, assigns, and transfers unto James Luttrell all its right, title, and interest in, of and to the Santo Tomas Coal Mine, located near Laredo, Texas, or any lease thereof.

"[Signed]       Mexican National Coal, Timber & Iron Co.,
                              "By Walter Hinchman, President.
"Attest:  Chas. W. Drake, Asst. Secretary."

This instrument was accompanied by a letter bearing like date to Luttrell from Drake, in which Drake signs as treasurer; said letter reading:

"New York, March 31, 1892.

"James Luttrell, Esq., Laredo, Texas—Dear Sir: There has been some delay in sending you the assignment of the coal, timber, and iron company's interest in the Santo Tomas Coal mine through the fact that Gen. Palmer started East on short notice, and the matter has been awaiting his attention. I now enclose the assignment herewith. If it is not in the necessary form, please send me form required, and it shall be executed and sent you. My understanding is that you expect to realize in the neighborhood of $10,000.00 in this transaction, and that of whatever you do realize one-third comes to the Mexican Coal, Timber & Iron Company, and it is on this understanding that I send you the power of attorney. In case there is any considerable variation from the above, please telegraph me before making use of the assignment.

"Yours truly,                              Chas. W. Drake, Treas."

Mr. Luttrell was at Laredo upon the date named endeavoring to effect an abandonment and conveyance to Macdonnell and Benavides;

the latter acting, through Macdonnell, as the duly appointed representative of the Benavides interest. This assignment to Luttrell, together with the letter, were exhibited to the said Macdonnell, and terms were practically reached; but the effort to adjust the matter, at this time, failed by reason of one of the parties, Dr. Wilcox, declining to join in the relinquishment of the mines. Thereupon Luttrell returned to his home in Boulder, Colo., writing Drake of the failure, and the cause thereof, and returning the assignment, or transfer. Drake, acting for complainant, acknowledged receipt and conveyed his regrets in letter of April 13, 1892, as follows:

"W. J. Palmer, 32 Nassau St.                    New York, April 13, 1892.

"James Luttrell, Esq., Boulder, Colorado—Dear Sir: I have your favors, noting that you failed in your negotiation for sale of the interest in the Santo Tomas lease, at least for the present; also noting the disastrous results of the operation of the mine for the last year. When I received your telegram of the 5th, I could not say in behalf of the company that you could go ahead and close without having answers to the questions I asked in my telegraphic reply of same date. If I had received those answers by telegraph, and they had been on the basis of your letter of 7th, I would have at once telegraphed you to close. Probably even if at a less price. For Gov. Hunt's sake, we all hope you will make another effort to dispose of this lease, and you will let me know by telegraph the best you can do. You shall have a prompt answer. Please make the telegram full enough so that I will understand it all. I do not think you can do the governor a greater service than to relieve him from this load. I have talked over the matter with Gen. Palmer, and we agree fully.
                "Yours truly,                    Chas. W. Drake."

In May following, the Milmo National Bank, which had previously obtained judgment against Hunt, and had sued out a garnishment against the Santo Tomas Coal Company, obtained a judgment against said company for about $23,000. Said coal company was not incorporated, and the testimony is conflicting as to the parties who composed it; Luttrell and others testifying that it was composed of Gov. Hunt, A. C. Hunt, Jr., Asa H. Stearns, A. W. Wilcox, and the Mexican National Coal, Timber & Iron Company, being the same parties who were joined with Gov. Hunt, as beneficiaries, in the suit against Macdonnell and Benavides. The parties, or some of them, at least Dr. Wilcox, feeling apprehensive lest the judgment might operate against him, personally, requested Mr. Luttrell to return to Laredo with the object of adjusting claims and judgments, and reconveying to the owners the leased premises.

The following agreement in settlement of all pending litigation was duly executed by the parties named, to wit:

                            "Laredo, Texas, June 9, 1892.
"State of Texas, County of Webb. .

"Know all men by these presents, that we, the undersigned, for and in consideration of the premises hereinafter stated, do by these presents settle and compromise the following suits now pending in the district court of Webb county, state of Texas, styled A. C. Hunt v. Teresa P. Benavides, No. 820, and Milmo National Bank v. A. C. Hunt and the Santo Tomas Coal Company, Garnishee, No. 898.

"The conditions of the above agreement are:

"(1) That plaintiffs in the case of A. C. Hunt v. Teresa P. de Benavides et al. take a judgment against the defendants except the Rio Grande & Eagle

Pass Railway Company and the Laredo Coal Company and C. B. Wright, in the sum of two thousand five hundred dollars with cost against plaintiff, to be paid to Nicholson & Dodd, attorneys for plaintiff, at once.

"(2) That the Milmo National Bank, upon Allan Macdonnell paying and securing to be paid to the said Milmo National Bank the further sum of nine thousand five hundred dollars on such terms as to security and time of payment as is satisfactory to said bank, will assign over, without recourse, its judgment against A. C. Hunt, principal, and Santo Tomas Coal Company, to the said Allan Macdonnell; and the said Milmo National Bank and its assignee, Allan Macdonnell, further agree to release from personal liability the said A. C. Hunt and A. W. Wilcox and also the persons now owning an interest in the said Santo Tomas Coal Company, the garnishee in the above judgment.

"(3) It is further agreed that A. W. Wilcox, Asa H. Stearns, A. C. Hunt, Jr., James Luttrell, J. W. Writer, the Mexican National Coal, Timber & Iron Company, and A. C. Hunt, Sr., trustee, will release and relinquish to Allan Macdonnell all interest they may have in and to certain mining lease made and entered into by C. M. Macdonnell and Teresa P. de Benavides and A. C. Hunt, trustee, about the 25th day of May, A. D. 1881, and that they will surrender the possession of, and shall relinquish unto said Macdonnell, the said Santo Tomas coal mine, and the tract of land in said instrument described, at once upon his complying with the obligations in this instrument upon him imposed. Provided that this contract is not binding upon the Milmo National Bank, unless the same in all things as hereinbefore stipulated be complied with within thirty days of date hereof; and, provided further, that the said Santo Tomas Coal Company shall have thirty days to settle all claims that may exist against said company to its employés and agents.

"Done this 12th day of May, A. D. 1892.

"The Milmo Nat. Bank,
"J. O. Nicholson, Agent and Attorney.
"Allan Macdonnell.
"A. W. Wilcox.
"Santo Tomas Coal Co.,
"By A. W. Wilcox, Act. Trustee."

Part of the purchase money ($2,500) was paid on that day, and at the expiration of 30 days the possession of the mining property was to be delivered, and a note given for balance of the purchase obligation, in accordance with the contract. Luttrell was advised of this settlement, and on May 22d, 10 days thereafter, he wrote to Drake inclosing the former assignment, and sending him a new form to be executed by the company to Allan Macdonnell. On the 28th of said month, Drake replied to Luttrell, saying that he had decided not to assign any interest which he controlled to Macdonnell until after Mr. Wilcox had answered some of his questions; and thereafter, on June 4th, he again wrote Luttrell, saying:

"The assignment sent you some time ago running to you was canceled and destroyed upon its return by you. The president of the company declined, in Gen. Palmer's absence, to execute another under present circumstances. * * * He is, as you know, in Europe, and it could not be done any way by the 11th (June), when you say you need it."

Luttrell met the parties in Laredo on the 11th day of June, but did not disclose the contents of the letter last referred to, but told Macdonnell that he had returned the transfer to the company for the purpose of having the transfer made direct to him (Macdonnell), still claiming that the assignment was in force, and indorsed the compromise made on May 12th; the settlement then and there being con-

summated.   Macdonnell and associates executed their note for $9,-500, which they seasonably paid, to the Milmo National Bank.   Macdonnell testified that he relied upon the statement of Luttrell that the assignment from complainant would be forthcoming, and for which he (Luttrell) gave his written warranty.

On June 11, 1892, Luttrell made conveyance to Macdonnell of the leased premises, and same was duly acknowledged and filed for record in the deed records of Webb county, and on the same day he executed this instrument:

"I, James Luttrell, hereby promise and agree to warrant and defend Allan Macdonnell, his heirs or assigns, against any claim or demand of the Mexican National Coal, Timber & Iron Company, to or for possession, or any interest in and to the Santo Tomas tract of land in Webb county, Texas, or any rights under a lease for mining on said tract, dated May 25, 1881, and recorded in volume 9, pages 382 and 383 of Webb county, Texas.

"Given at Laredo this 11th day of June, A. D. 1892.

"James Luttrell.

"Witness:
   "A. W. Wilcox.
   "E. A. Atlee."

Copies of these papers, together with release executed by Hunt, and all other parties claiming an interest as beneficiaries, were promptly sent by Luttrell to Drake, and thereupon, having finished his business, he again returned to his home in Colorado, and received from Drake a letter confirming his acts, in tenor following:

"New York, June 23, 1892.

"James Luttrell, Esq., Boulder, Colorado—Dear Sir:  I have yours of June 20th.  I am glad that you succeeded in settling the suit in mine case matter as you did, and I will endeavor to get the release which you enclosed to me executed and return to you in time for your purposes, as will also do with the transfer of sale by A. C. Hunt, trustee."

The defendants contend that the assignment to Luttrell, being in writing and proper form, passed all interest then owned, or claimed, by the complainant, and that the conveyance from Luttrell to Allan Macdonnell of June 11, 1892, placed the title to the property in said Macdonnell, regardless of   the fact that the assignment had been returned; and that simply returning said instrument would not of itself pass the title out of Luttrell, even though the same has been canceled and destroyed by Drake.  It may be well to state the testimony of Luttrell in relation to this assignment:

"Q. Who acted for the Mexican National Coal, Timber & Iron Company? A. I had to become responsible that they would act.  I acted for them, guarantying that they would act.  Q. You had an absolute assignment from them? A. I had returned it; I had had it, but returned it to them for the purpose of making it direct to Mr. Macdonnell, instead of coming through me.  I did not want to be a party.  Q. At the time you made the arrangements for this settlement, you had this assignment from them?  A. Yes, sir.  Q. This assignment from them of their interest, and the only reason you sent it back, as I understand it, was for them to make direct transfer in accordance with your contract for the abandonment, instead of letting the transfer be made through you?  A. That was exactly the way of it.  Q. Now, you showed the assignment you had to Mr. Macdonnell when you were treating with him?

A. I did.  Q. I would like for you to identify this letter, dated March 31, 1892, and state whether that is the letter that accompanied the assignment when it was sent to you?  A. Yes, sir; this is the letter accompanying the assignment dated March 31, 1892.  Q. This letter, I notice, states that, if the assignment is not in the necessary form, you should send him the form required, and he would have it executed, and sent to you?  A. Yes, sir; he did not know what form would be required."

After the first negotiations failed, Luttrell had left Laredo and gone to Colorado.  Questioned as to his return to Laredo, and his reasons for returning, he said:

"Q. Can you fix the time, Mr. Luttrell, when you went back to Laredo? A. About the 6th of June, I would think.  Q. Was it not in the early part of May?  A. No, sir; I was not there in May.  It must have been in June before I got there.  It must have been the 6th or 7th of June.  I think about the middle of May Dr. Wilcox commenced writing me to go.  Q. That is when Dr. Wilcox commenced writing to you?  A. Yes, sir.  Q. How did you happen to come back?  A. At the request of Gov. Hunt to consummate the sale of the coal mines.  Q. At the request of Gov. Hunt to consummate the sale of the coal mines?  A. To assist; yes, sir.  Q. What assistance were you to give?  A. To transfer this Mexican National Coal, Timber & Iron Company's interest to me.  I represented them in that matter.  They had assigned to me and assured me that they would like to have me help them get rid of it.  I was acting for them in a friendly way.  The letters in testimony go to show that I would make an effort to help them get rid of it."

While it appears that Luttrell assured Macdonnell that the assignment would be forthcoming, and while the record testimony discloses that Macdonnell relied upon this assurance, and so relying paid out $12,000 in settlement of all adverse claims, it clearly appears that no portion of said sum ever reached complainant, nor was any part thereof paid to any other person for the account, use, or benefit of said complainant; and it occurs, as a matter of law, that the letter accompanying said assignment, which was shown to Macdonnell (see his testimony), at the time exhibition was made of the transfer, is a part thereof.  It follows that the two instruments should be construed together, the legal effect of which would be that the instruments, taken together, would have the force of a power of attorney, in the nature of a special and limited authority, authorizing the attorney, Luttrell, to sell the interest of complainant upon the terms contained in said letter, and not otherwise.  From this letter it was apparent that the act of sale contemplated that complainant should get one-third of $10,000.  If there was any considerable variation from this sum, the attorney was not to act without further authority.

It is contended that the letter from Drake to Luttrell, of date June 23, 1892, in which he expressed his gratification and approval of the settlement, operates as a confirmation of the sale to Macdonnell, and complainant is now estopped by reason thereof.  The transfer from the complainant to Luttrell, under date of March 31, 1892, and the letter from Drake, secretary of complainant, inclosing the transfer, having been executed contemporaneouly, between the same parties, and relating to the same subject-matter, are constituent parts of the same agreement, to be considered as one instrument, and are to receive the same interpretation and construction as if embodied in one and the same instrument.  Howard v. Davis, 6 Tex. 179; Stephens v. Sherrod,

6 Tex. 297, 55 Am. Dec. 776; Dunlap's Adm'r v. Wright, 11 Tex. 602, 62 Am. Dec. 506; Wallis v. Beauchamp, 15 Tex. 305; Alexander v. Baylor, 20 Tex. 560; Compton v. Perry, 23 Tex. 423; Taylor v. Hudgins, 42 Tex. 246; Burgess v. Millican, 50 Tex. 402; De Bruhl v. Maas, 54 Tex. 473; Moody v. Paschal, 60 Tex. 484; Horne v. Chatham, 64 Tex. 41; Purdom v. Boyd, 82 Tex. 135, 17 S. W. 606. Powers of attorney, unlike deeds and wills, are to be strictly construed. The authority delegated is limited to the meaning of the terms in which it is expressed; and where authority to perform specific acts is given, and general words are also employed, such general words are limited to the particular acts authorized, and the general words in the transfer are controlled by the letter inclosing it, which authorized a specific act—sale of property for stated price. Frost v. Cattle Co., 81 Tex. 509, 17 S. W. 52, 26 Am. St. Rep. 831; Henry v. Lane, 128 Fed. 250, 62 C. C. A. 625. The authority delegated in a power of attorney is limited to the meaning of the terms in which it is expressed, and the power granted must be ascertained from the instrument accompanying the transfer. Skaggs v Murchison, 63 Tex. 353; Frost v. Cattle Company, 81 Tex. 509, 17 S. W. 52, 26 Am. St. Rep. 831; Wynne v. Parke, 89 Tex. 413, 34 S. W. 907.

In Skaggs v. Murchison, supra, the rule is thus stated:

"It is so well settled as to be elementary that powers of attorney and similar instruments have to be strictly construed, and that under no circumstances will the principal be bound beyond the plain import of the instrument."

This authority and many others are cited and approved in Henry v. Lane, 128 Fed. 250, 62 C. C. A. 625, by the Circuit Court of Appeals, Fifth Circuit, in an elaborate and exhaustive opinion.

Therefore it follows that the contention of defendants that the title of complainant passed by the assignment to Luttrell must be denied.

Upon the question of ratification by complainant of sale made by Luttrell, it is sufficient to say that the letter of Drake, approving the action of Luttrell, was but the expression of his personal approbation, and therefore not binding upon the company.

It is next in order to consider the legal effect of the declaration of abandonment of the mining enterprise made by Gov. Hunt, with the view of ascertaining his power in the premises, and its effect upon the adverse claims here asserted. If the trustee acted in good faith, based upon sound judgment, free from any act or suspicion of fraud, then it would seem that the beneficiary, though having an assigned interest in the subject-matter of this suit, would be bound by the act of the trustee, for the reason that the beneficiary could only take under the terms of the lease, charged with notice of the contents, to the effect that the trustee had reserved unto himself the right to abandon in the event the undertaking proved unsuccessful.

The instrument executed by the trustee, Hunt, is in the following language:

"Know all men by these presents: That whereas, by virtue of a certain agreement with C. M. Macdonnell, now deceased, and Teresa P. de Benavides, evidenced by an instrument in writing dated the 25th day of May, A. D. 1881, which is of record in the records of deeds of Webb county, Texas, in volume 9, on pages 382, 383, to which reference is hereby made, Alexander C. Hunt,

as trustee, did enter upon a mining enterprise to be conducted by him in accordance with the terms and conditions stipulated in said written instrument:

"And whereas, Albert C. Hunt, and A. W. Wilcox, of Webb county, Texas, Asa H. Stearns, of Arapahoe county, Colorado, and the Mexican National Coal, Timber & Iron Company, a corporation created under the laws of the state of Colorado, having its principal office in Denver, in said state, are the beneficiaries intended and included in said trust, whose interest in said mining enterprise is two-thirds (⅔) thereof:

"And whereas, the said mining enterprise has not been successful and has resulted in continual losses and said parties do not intend longer to prosecute the same, but desire to cease operation and to discontinue, abandon and dissolve the said mining enterprise.

"Now therefore, know ye, that in consideration of the premises, the said parties acting by and through the said Alexander C. Hunt, trustee, do by these presents make known and declare their purpose, and do now relinquish and abandon the said mining enterprise, and do now refuse to be any longer held to a performance of the stipulations, terms and conditions of the said written instrument, and the said parties, and their said trustee as well, do hereby relinquish and abandon unto the legal representatives of the said C. M. Macdonnell, deceased, and unto the said Teresa P. de Benavides, her heirs and assigns, all and every their right, interest and claim whatsoever which they, or any of them, may have, or had, or could have and claim under and by virtue of the terms of said written instrument; and in furtherance of this abandonment the said parties have ceased to operate and will no longer operate the coal mines within the tract of land described in said instrument and have discharged all miners and other employés in and about the said mines, and they do now hereby make known and declare that on the 9th day of April, A. D. 1892, all obligations and responsibilities on their part growing out of the terms and stipulations of said written instrument shall cease and shall be no longer binding upon them.

"And in testimony hereof the said Alexander C. Hunt, trustee, for himself and the beneficiaries aforesaid, has hereunto signed his name on this the 1st day of April, A. D. 1892.

his<br>"Alexander C. X Hunt.<br>mark.

"James Macdonald.
"Walter T. Wright."

The above instrument was acknowledged by Hunt in statutory form on April 1, 1892, and thereafter seasonably delivered to Macdonnell. This conveyance was delivered by Gov. Hunt in person to the parties at interest on June 11, 1892.

It is contended by the complainants that this instrument was given in settlement of debts owing by the trustee in fraud of complainant's rights, and as the result of confederation and conspiracy upon the part of said trustee and defendants—Macdonnell and others—to acquire the property, and thereby unjustly deprive the adverse party of substantial interest. If this is true, courts of equity would not countenance the act, nor aid in the spoliation, but upon timely action being had, would annul the transaction. The allegations of fraud are multitudinous. It is ever easy to make the charge—often difficult to maintain it. What reason moved the trustee to make the declaration of abandonment? Does it not reasonably follow that, the venture proving unprofitable, the operations causing a heavy loss to the trustee and no rent or dividend to the owners, one, or all, would naturally grow anxious, if not feverish, to end a condition fast approaching the intolerable? The testimony, beyond question, establishes the fact that the trustee was sustaining heavy losses, and the owners without

the hope of expectancy. Luttrell writes of the great loss sustained, and Drake is not complacent in noting the disaster attending the effort. With the money markets closed to the undertaking, the complainant then, as ever before, without a dollar in its treasury, with no assets, save this asserted claim now urged by its former directors and stockholders, is there any other conclusion to be entertained than that the real motive of the trustee is fairly and truthfully stated in the written declaration of abandonment? The testimony abundantly establishes that losses were ever present in the prosecution. Were they to continue, when hope for better results was no longer entertained, when the deliberate judgment of the trustee was that failure must mark the demise of the undertaking, when no party at interest had the courage to challenge his declaration? There is an end to all things, and this mining lease, judged purely from results, had its natural sequence.

There is no word of testimony in the record reflecting upon the act, the character, or the integrity of the man, who, in other days, attained high social standing in his state and other portions of this country. Intrusted with the active management and development of large enterprises and constructive work, demanding great expenditures, it is proper to make the observation that living, he received the confidence of his fellows; that dead, his memory should not be unjustly assailed. Those who look to this record will find naught to mar his character, assail his purpose, criticise his conduct, or impugn his motives in or about any transaction pertinent to this inquiry.

It is a fact that in the compromise of May 12, 1892, the Milmo National Bank and its assignee, Allan Macdonnell, agreed to release from personal liability A. C. Hunt and A. W. Wilcox, and also "the persons now owning an interest in the Santo Tomas Coal Company." This language is broad enough to cover the complainant. No portion of the sum paid went to Hunt. $12,000 was paid by Allan Macdonnell; $2,500 to the attorneys of record, and $9,500 to the Milmo National Bank. This was intended to be in full settlement of all pending litigation. It does not appear that Hunt was in point of fact a party to this settlement. His name does not appear signed to the agreement, nor does any one pretend to act for him. Wilcox seemed anxious to be relieved, though there was no personal judgment against him, and therefore nothing from which to be relieved. This could not have been the moving motive upon the part of Hunt, for the reason that the abandonment was signed and acknowledged by Hunt on the 1st day of April, 1892, nearly six weeks before the consummation of the compromise above referred to; and, further, Hunt was not to be released until the complainant executed its conveyance.

The garnishment by the Milmo Bank shows by affidavit that he (Hunt) had nothing in Texas subject to execution. Under the allegations of the bill and cross-bill, he was insolvent, and not responsive. With his earning capacity behind him, and old age pressing its care upon his form, what occasion was there for concern about the attitude of this creditor in the collection of an ancient account gone to judgment? The agreement was to cancel the judgment

upon receiving conveyance from all the parties, including the complainant. The record does not disclose that the judgment against Hunt was ever released. It may have occurred to the parties that the law does not contemplate the doing of a useless thing. Upon this point the record is silent. If the working of the mine was without profit, and about this there can be no serious contention, it would appear that, in the exercise of sound judgment, abandonment was the sole alternative.

Will courts of equity aid complainant, after a delay of four years and nine months, with almost instant knowledge of the entire transaction?

As against the claim of Studebaker Bros. Manufacturing Company, it is urged that no recovery can be had, because defendants, and those under whom they claim title, leased the property in controversy to Hunt, trustee, that the lease was made by the then owners of the land, because they relied upon the experience, ability, and power of the said Hunt to carry out the agreements and covenants in said lease contained, and did not rely upon the capacity, experience, or knowledge of any other person, and therefore the interest of Hunt was that of tenant, and was not subject to be levied upon by execution, or other writ. The claim of Studebaker Bros. is based upon the following facts. Attachment was run upon the interest of Hunt. Judgment and foreclosure of lien obtained in September, 1892, and purchase of his interest in the "Santo Tomas mines" of date November 1, 1892.

At common law, leasehold interests could be sold, or transferred, without the consent of the owner of the land, and the rule obtains in many states. In Texas the rule is governed by the statutes, to wit, article 3122 of the Revised Statutes of 1895:

"If lands or tenements are rented by the landlord to any person or persons, such person or persons renting said lands or tenements, shall not rent or lease said lands or tenements during the term of said lease to any other person without first obtaining the consent of the landlord, his agent or attorney."

The case of Moser v. Tucker, 87 Tex. 96, 26 S. W. 1044, would seem to support this contention of defendants. This opinion by Judge Stayton holds:

"That the interest of the lessee is not subject to forced sale, for such sales must be made at auction, and the officer selling would have no power to place any restrictions on bidders based on their fitness for tenants or ability to pay rents as they might fall due."

In this way the forced sale of Hunt's interest in the leasehold might pass to parties who had neither interest nor inclination in the active prosecution of the work, and could hinder and even destroy the particular undertaking.

In the discussion of the various branches of this case, the statutory period known as the four years' statute awaits disposition. This act is as follows (Rev. St. 1879, art. 3207; Rev. St. 1895, art. 3358):

"Every action, other than for the recovery of real estate, for which no limitation is otherwise prescribed, shall be brought within four years next after the right to bring the same shall have accrued, and not afterwards."

It is claimed by the adverse parties that their causes of action are for the recovery of real estate, and therefore not subject to the operation of the above statute. By the terms of the instrument (lease) Hunt, as trustee, and his successors in the trust, were alone entitled to the possession. Trespass to try title will only lie in favor of one entitled to possession of the land sued for. In Cook v. Caswell, 81 Tex. 684, 17 S. W. 385, it is held:

"A plaintiff, in an action of trespass to try title, must show that he has a possessory title to the land at the time of the suit."

In the pending case, the adverse parties allege that the right of possession is not in them, but is and can only be exercised by a trustee to be appointed by the court to execute the trust evidenced by the mining lease of May 25, 1881. The complainant seeks to cancel the act of abandonment by Hunt, dated April 1, 1892, and the sale by James Luttrell of June 11, 1892, upon the ground that said instruments were fraudulent and without authority. Until these instruments are avoided and canceled, the court will be unable to award relief.

In the following cases it has been held that the statute of limitations of four years was applicable to and barred the right of plaintiff to recover: Shirley v. Waco Tap Ry. Co., 78 Tex. 131, 10 S. W. 543. This was a suit to avoid for fraud a conveyance of land donations. Cooper v. Lee, 75 Tex. 114, 12 S. W. 483. This was a suit to set aside a deed to land for fraud upon the part of the vendee, and to recover the land. Fuller v. Oneal, 82 Tex. 417, 18 S. W. 479, 481. This suit was for appointment of a trustee to execute power of sale contained in deed of trust to secure payment of debt barred at date of institution of suit. In Norton v. Davis, 83 Tex. 32, 18 S. W. 430, plaintiff brought suit against Norton, who claimed under a deed defectively acknowledged by plaintiff, a married woman. Defendant prayed for a decree correcting the defective acknowledgment and judgment for the land. Held, that as defendant could not establish against plaintiff his right to the land without first procuring the validation of the defective acknowledgment, the suit was, in effect, for the latter purpose, though the recovery of the land, or the establishment of his right thereto, might follow, as the consequence of the principal relief. Chicago, Texas & Mexican Ry. v. Titterington, 84 Tex. 218, 19 S. W. 472, 31 Am. St. Rep. 39: This suit was to annul a deed for right of way, and to recover the land. Fraud in securing the conveyance, failure of consideration, etc., were alleged. The court held:

"(1) That the suit was primarily to cancel the deed, and that the judgment for the land prayed for would be the result of such relief to be first granted; (2) that therefore the statute of four years barred the plaintiff's case."

A suit is not necessarily one "for recovery of real estate," because such recovery will follow as an incident to the plaintiff's success. The five years' statute has application to cases in which the plaintiff can sue in trespass to try title, and it has no application to cases in which the plaintiff sues to set aside contracts or deeds that were consummated in fraud, though, as a result of such cancellation, the plaintiff may recover the title and possession of the land.

In the case above referred to (Cooper v. Lee, 75 Tex. 114, 12 S. W. 483), plaintiff filed suit to recover two tracts of land. By amend-

ment it was alleged that defendant, by reason of false representations to plaintiff, obtained a deed to one of said tracts, and this deed plaintiff sought to cancel and annul, and thereby obtain possession. Judge Henry, speaking for the court, said:

"If the transaction was fraudulent, Lee had a cause of action for its rescission growing out of the transaction itself, and four years is the period prescribed by our statute within which such action shall be brought."

The case of Rutherford v. Carr (Tex. Sup.) 87 S. W. 815, opinion by Judge Brown, would seem to be decisive of the question now under discussion:

"The judgment creditor has the election of two remedies against a fraudulent conveyance; that is, he may bring a suit to set aside the conveyance, or he may levy upon the land and sell it for his debt, and then bring suit for its possession." If he elects the first action, his suit must be brought within four years; but, if he elects the second action, he is permitted to bring it in five years."

In this particular case the court held that the application of the statute depends upon the character of the action, and, this being an action for the recovery of real estate, the four years' statute is excepted in express terms, and the plaintiff's right to recover land was not barred.

In the case of McCampbell v. Durst, 40 S. W. 315, 15 Tex. Civ. App. 522, the court says:

"As the right of the plaintiff, therefore, was one which was required to be asserted by a direct proceeding to procure a decree annulling the deeds under which defendants claim, and hence could not support an action of trespass to try title, it seems to necessarily follow that an action such as this, of the kind necessary to enforce such right, is not an action for the recovery of land, in the sense of the statute of limitation. An unavoidable consequence of this is that the four years' statute applies, and the cause of action was barred before the suit was brought. This result is in harmony with the doctrines which have been applied by the courts before this statute was passed in suits asserting such rights as this. They were never placed on the same plane as legal titles, and were always treated as liable to become stale by lapse of time, if not asserted, whether there were adverse possession of the land or not. While the holder of a legal title might sue one asserting an adverse claim, though not in possession, no limitation ran until possession was taken. Not so with persons invested with rights which required the affirmative action of equity to mature them into complete title. To hold that this four years' statute of limitation does not apply would be to hold that there is no limitation to this kind of suit, and that equities such as this are only barred by adverse possession; or else to say that the courts are still to have resort in such case only to the doctrine of stale demands."

The prayers of the complainant for cancellation of deeds, etc., are set out in section 27 and 34 of complainant's bill, and the chief relief sought is the cancellation of the several deeds and leases therein set out in detail.

In the case of Patterson v. Hewitt, 195 U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 214, the court, speaking through Mr. Justice Brown, says:

"The defense of laches, which prompted the dismissal of the bill in this case, has so often been made a subject of discussion in this court that a citation of cases is quite unnecessary. Some degree of diligence, etc., in bringing suit, is required under all systems of jurisprudence. In actions at law,

the question of diligence is determined by the words of the statute. If an action be brought the day before the statutory time expires, it will be sustained; if the day after, it will be defeated. In suits in equity, the question is determined by the circumstances of each particular case. The statute of limitations consorts with the rigid principles of the common law, but is ill adapted to the flexible remedies of a court of equity. The statute frequently works great practical injustice; the doctrine of laches, never. True, lapse of time is one of the chief ingredients, but there are others of almost equal importance. Change in the value of the property between the time the cause of action arose, as well as his diligence in availing himself of the means of knowledge within his control, are all material to be considered upon the question whether the suit was brought without unreasonable delay."

In the case of Kessler v. Ensley Land Company (C. C.) 141 Fed. 130, this statement is made:

"Complainants insist that the delay of over four years, under the circumstances disclosed by the bill, cannot bar them of relief because this was a suit in equity for the recovery of land, and that the limitation to such actions by the statutes of Alabama, where the suit was pending, is 10 years, and that the statute by its terms applies to suits in chancery as well, and that the federal court sitting in this state is bound by the statutes, or, if not bound, ought to follow the decisions which are cited, construing the statute, and which give complainants the full statutory period in which to sue."

But the court says:

"The fundamental doctrine upon which courts of the United States administer equity must be the same in every state and cannot be changed by state statutes"—citing Kirby v. Lakeshore, 120 U. S. 138, 7 Sup. Ct. 430, 30 L. Ed. 569.

In the latter case the Supreme Court, speaking through Mr. Justice Harlan, and reviewing many cases, said:

"That, while the courts of the Union are required by the statutes creating them to accept as rules of decision in trials at common law the laws of the several states, their jurisdiction in equity cannot be impaired by the local statutes of the different states in which they sit."

Chief Justice Marshall, in United States v. Howland, 4 Wheat. 108, 4 L. Ed. 526, says:

"That as the courts of the Union have a chancery jurisdiction in every state, and the judiciary act confers the same chancery powers on all, and gives the same rule of decision, its jurisdiction must be the same in all the states."

In Payne v. Hook, 74 U. S. 425, 19 L. Ed. 260, it is said:

"We have repeatedly held that the jurisdiction of the courts of the United States over controversies between citizens of different states cannot be impaired by the laws of the state, and that the equity jurisdiction of the courts of the United States is subject to neither limitation nor restraint by state legislation, and is uniform throughout the different states of the Union."

It is not necessary to pursue the discussion further. It would appear that an abandonment of work upon a coal mine for a period of more than four years ought, in itself, to operate as a cancellation of the mining lease and forfeiture of all rights claimed thereunder. Be this as it may, under the doctrine announced in the federal authorities above cited, and the four years' statute of limitations, and

its construction in like cases by the courts of this state, it follows that the causes of action herein sued upon are barred.

The bill and cross-bill should be dismissed, and the decree will so provide.